Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Joshua Bloom and Andrea Holliday Bloom and Co-Lead Counsel for the Class*

Omar Jafri (*pro hac vice*)
Genc Arifi (*pro hac vice*)
POMERANTZ LLP
Ten South La Salle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
ojafri@pomlaw.com
garifi@pomlaw.com

*Counsel for Insun Lee and Co-Lead Counsel for the Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re aTyr Pharma Inc. Class Action Securities Litigation | Lead Case No.: 3:25-cv-02681-WQH-SBC |
| This document relates to:<br><br>Case No. 3:25-cv-02681-WQH-SBC<br><br>Case No. 3:25-cv-02826-WQH-SBC | **SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

Page


TABLE OF DEFINITIONS ........ iv

I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 10

III. THE PARTIES ........ 10

IV. SUBSTANTIVE ALLEGATIONS ........ 12

A. aTyr's Business and Operations ........ 12

B. The Jefferies ATM Agreement ........ 12

C. Efzofitimod and Pulmonary Sarcoidosis ........ 14

D. FDA Regulatory Framework for Clinical Drug Development ........ 15

E. The Phase 1b/2a Trial of Efzofitimod in Pulmonary Sarcoidosis ........ 17

F. The Phase 3 Trial Design ........ 17

G. Defendants Falsely Claim aTyr Demonstrated "Proof of Concept" for Efzofitimod and Misrepresented That the Phase 1b/2a Trial Showed Efficacy ........ 19

H. Defendants Materially Altered the Phase 3 Secondary Endpoints Mid-Trial, But Failed to Adequately Disclose the Implications of the Changes to Investors While Falsely Representing that the Trial Remained "Unmodified" ........ 21

I. Defendants Made Objectively False and Misleading Representations Regarding the Phase 3 Trial's Statistical Power and Probability of Success ........ 22

V. EXPERT ANALYSIS of DR. ABROUK, PH.D. ........ 26

A. Dr. Abrouk's Qualifications ........ 27

B. Dr. Abrouk's Key Opinions ........ 28

1. Opinion 1: The Phase 1b/2a trial did not show "efficacy." ....... 30

2. Opinion 2: The Phase 1b/2a results did not establish "Proof of Concept." ....... 38

3. Opinion 3: The Phase 1b/2a results did not demonstrate "dose response," but rather generated a numerical exploratory dose-dependent hypothesis to be tested in a rigorous further study. ....... 41

4. Opinion 4: The *post hoc* pooled analyses violated the fundamental analyze as you randomized experiment principle. ....... 43

5. Opinion 5: The Phase 1b/2a placebo response made aTyr aware of the need to adequately power the Phase 3 trial. ....... 44

6. Opinion 6: The Phase 3 Power Representation Rested on An Assumed Treatment Effect Defendants' Own Data Had Never Produced and on an Undisclosed Recalculation. ....... 45

7. Opinion 7: The SAP Confirms the 3 mg/kg Arm Was Not a Real Shot on Goal. ....... 49

8. Opinion 8: Defendants Reshuffled Phase 3's Secondary Endpoints in an Attempt to Obfuscate the Trial's Failure. ....... 53

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS & OMISSIONS ....... 57

VII. THE TRUTH EMERGES ....... 87

VIII. ADDITIONAL FACTS PROBATIVE OF SCIENTER ....... 91

A. Core Operations ....... 91

B. Defendants Held Themselves Out as Knowledgeable About the Concealed Information ....... 92

C. Defendants Had Access to Granular Data Unavailable to Investors ....... 95

D. Shukla's Authorship of the CHEST Study Enhances Scienter ........ 98

E. Individual Defendants' Claimed Expertise Supports Scienter ........ 98

F. aTyr's Eleventh-Hour Changes to the Phase 3 Trial Are Demonstrative of Scienter ........ 100

G. Dr. Abrouk's Expert Opinions Bolster an Inference of Scienter ........ 101

H. Financial Motive and Opportunity Created by the Jefferies ATM Agreement ........ 103

I. Admissions Following the Phase 3 Failure ........ 104

IX. LOSS CAUSATION AND ECONOMIC LOSS ........ 105

X. CLASS ACTION ALLEGATIONS ........ 110

COUNT I: (Violations of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants) ........ 112

COUNT II: (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants) ........ 114

COUNT III: (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants) ........ 116

PRAYER FOR RELIEF ........ 117

DEMAND FOR TRIAL BY JURY ........ 118

## TABLE OF DEFINITIONS

| Abbreviation / Defined Term | Full Term |
|---|---|
| 2024 10-K | Annual Report on Form 10-K for FY2024 |
| Dr. Abrouk | Dr. Nacer Abrouk, Ph.D. |
| AE | Adverse Event |
| ATM | At-the-market offering |
| aTyr or the Company | aTyr Pharma Inc. |
| BLA | Biologics License Application |
| Broadfoot | Jill M. Broadfoot |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CHEST study | CHEST Journal publication (Culver et al.) |
| Class Period | June 5, 2024 to May 15, 2026, both dates inclusive |
| Complaint | Second Amended Consolidated Complaint for Violations of the Federal Securities Laws |
| Defendants | aTyr together with the Individual Defendants |
| DLCO | Diffusing capacity of the lungs for carbon monoxide |
| DSMB | Data and Safety Monitoring Board |
| FDA | U.S. Food and Drug Administration |
| FVC | Forced vital capacity |
| Individual Defendants | Shukla and Broadfoot |
| KSQ | King's Sarcoidosis Questionnaire |
| MMRM | Mixed Model Repeated Measures - a linear statistical model that compares drug to placebo using longitudinal data (i.e., from all visits). |
| NASDAQ | Nasdaq stock market |
| NDA | New Drug Application |
| NRP2 | Neuropilin-2 protein |
| OCS | Oral corticosteroids |
| PGA | Patient Global Assessment |

| Abbreviation / Defined Term | Full Term |
|---|---|
| Phase 1b/2a trial | Efzofitimod Phase 1b/2a clinical trial |
| Phase 3 trial | Phase 3 EFZO-FIT clinical trial |
| Proof of Concept | Clinical Proof of Concept |
| SAP | Statistical Analysis Plan |
| SEC | United States Securities and Exchange Commission |
| Shukla | Sanjay S. Shukla, M.D., M.S. |

Co-Lead Plaintiffs Joshua Bloom, Andrea Holliday Bloom, and Insun Lee ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Second Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by aTyr Pharma, Inc. ("aTyr" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of aTyr's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) consultation with a well-qualified expert on biostatistics and clinical trials; and (e) information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many facts supporting the allegations contained herein are likely to be known only to, or are within the exclusive control of, Defendants.

## I. NATURE OF THE ACTION

1. This securities fraud class action arises from a fraudulent scheme by aTyr and its top executives designed to mislead investors regarding Efzofitimod, the Company's only drug candidate. Throughout the Class Period, Defendants misrepresented the efficacy and statistical power of an early Phase 1b/2a clinical trial of Efzofitimod (hereafter the "Phase 1b/2a trial"), the integrity of the Company's ongoing later-stage Phase 3 EFZO-FIT clinical trial (hereafter the "Phase 3 trial"), and the viability of the Company's regulatory path to approval.

2. Defendants painted a deceptively optimistic picture of Efzofitimod's clinical trials, thereby attracting investors and maintaining an artificially inflated stock price by doing the following:

- Misrepresenting the results of an underpowered preliminary Phase 1b/2a trial as showing "efficacy" and "clinical Proof of Concept" ("Proof of Concept");
- Fabricating claims of "dose response" from statistically insignificant data and numerically unimpressive differences from placebo;
- Repeatedly assuring investors that the Phase 3 trial was "always overpowered" at more than 90% when it was actually insufficiently powered; and
- Falsely representing that the Phase 3 trial gave investors "two shots on goal" — i.e., that both dose arms of the trial were powered to succeed — when the Company's own concealed Statistical Analysis Plan ("SAP") reveals that only one arm was given a meaningful chance of demonstrating efficacy.

3. Defendants perpetrated this fraud during a period when they stood to gain enormously from an artificially inflated stock price. Throughout the Class Period, aTyr was actively selling shares through an at-the-market ("ATM") offering program — a mechanism that allows a company to sell newly issued shares directly into the open market at prevailing prices. Because the amount of capital raised per share is directly tied to the stock price, Defendants had a powerful financial incentive to make false and misleading statements that inflated aTyr's stock price. In total, aTyr raised nearly $100 million through ATM sales around the Class Period, including approximately $29.8 million in the five weeks immediately preceding the Phase 3 trial failure announcement. This was not supplemental capital; it was the Company's financial lifeline. aTyr generated only $190,000 in total revenue from licensing agreements, and no revenue from product sales, for all of fiscal year 2024. The Company was burning approximately $62 million a year in operating cash and posted a net loss of $74.1 million for FY2025 — yet its total cash, cash equivalents, and investments stood at only $80.9 million as of December 31, 2025. Without the ATM

proceeds, aTyr would have been unable to fund its operations, including the Phase 3 trial itself.

4. Over the course of a series of partial corrective disclosures, Defendants' fraud was revealed to the market: (i) the Phase 3 trial failed to meet its primary endpoint; (ii) the FDA rejected the Phase 3 trial data as a basis for approval and required an entirely new pivotal trial; and (iii) the Company lacked sufficient capital to fund the study the FDA demanded. These revelations caused catastrophic losses for investors, erasing hundreds of millions of dollars in shareholder value.

5. aTyr is a clinical-stage biotechnology firm with no commercial products, no revenue, and a 20-year history of strictly research-focused operations. Consequently, the Company's survival depended entirely on its market valuation, which in turn depended entirely on the success of its sole late-stage drug candidate, Efzofitimod. During the Class Period, aTyr had no alternative pipeline assets to cushion the blow of a clinical failure. This created a binary investment profile in which the Company's stock price was tethered exclusively to the perceived efficacy of Efzofitimod. With analyst projections of $2 billion in future sales and aTyr Chief Executive Officer ("CEO") Sanjay S. Shukla's, M.D., M.S. ("Shukla") own public estimates of $5 billion, the stakes of the Phase 3 trial were existential: the success of the drug was the success of the Company.

6. Efzofitimod is intended to treat pulmonary sarcoidosis, a chronic condition in which inflammatory masses (granulomas) progressively impair lung function. Because there are no U.S. Food and Drug Administration ("FDA") approved therapies specifically for the disease, the current "standard of care" relies on high-dose oral corticosteroids ("OCS" or "steroids"). While these steroids promote healthy lung function by managing inflammation, they are notoriously toxic, causing debilitating long-term side effects such as diabetes and osteoporosis.

7. aTyr claimed that Efzofitimod would solve this clinical dilemma by controlling the disease while enabling patients to taper off toxic steroids.

8. The Phase 1b/2a trial was a small-scale safety study that lacked the statistical power to establish efficacy, or Proof of Concept, or to support an adequately statistically powered pivotal Phase 3 launch. With only 37 patients and a massive 24.3% dropout rate, the trial's data was inherently fragile and necessitated follow-up by a more robust Phase 2b that should have preceded a Phase 3 launch. The secondary efficacy endpoints failed to achieve statistical significance ($p<0.05$), showing only an unimpressive and negligible "numerical trend." Specifically, the 5 mg/kg dose resulted in a steroid reduction of just 1.6 mg per day — a far cry from the 10 mg or 50% reduction thresholds required for clinical significance.

9. The severe limitations of these results were confirmed in the peer-reviewed journal CHEST, where researchers noted that the Phase 1b/2a trial findings were "statistically nonsignificant" across all doses. Rather than establishing "efficacy" or Proof of Concept, the study authors explicitly characterized the results as merely "hypothesis generating." By moving to Phase 3 based on such tenuous data, aTyr bypassed the necessary rigor of drug development in favor of a high-risk gamble. Consequently, aTyr's failure to conduct a rigorous Phase 2b clinical trial that established an efficacy Proof of Concept with the appropriate effect size heightened the risk that the Phase 3 trial would fail.

10. Nevertheless, Defendants repeatedly and falsely told investors that the Phase 1b/2a trial had demonstrated "efficacy," established "Proof of Concept," and had shown "dose response" — three terms of art in the biopharmaceutical industry that convey a drug has cleared meaningful scientific hurdles.

11. Making matters worse, Defendants repeatedly assured investors that the Phase 3 trial was "always overpowered" and "powered more than 90%" to show that "either" the high dose or low dose of Efzofitimod was "statistically superior to placebo." Statistical power in a clinical study is the probability that the study will correctly detect a true difference or treatment effect if one actually exists. It represents the ability of a study to avoid a "false negative." A trial powered at 90%

has a 90% chance of producing a clear answer if the assumptions behind that number are sound. Those assumptions were not. In fact, they were contradicted by Defendants' own data. Defendants assumed the drug would reduce steroid use by 3 milligrams per day more than placebo. But the only trial in which Efzofitimod had ever been tested — the Phase 1b/2a — showed a drug-attributable advantage of just 2.2 milligrams per day. In other words, the 90% power claim held only if Efzofitimod performed roughly 36% better in Phase 3 than it had ever performed before. Defendants never disclosed that contingency to investors.

12. Defendants concealed the SAP from investors throughout the Class Period, depriving them of the very document that contradicted Defendants' false and misleading representations. It was not available during the Class Period and was disclosed by Defendants for the first time in this litigation. After Defendants improperly attached the SAP to their motion to dismiss in an attempt to inappropriately argue the merits, Plaintiffs requested that Defendants produce all versions of the SAP since the one filed previously appears to be from August 2025, i.e., after most of the false and misleading statements during the Class Period were made. Defendants refused to produce anything beyond the version of the SAP they filed. It is unclear whether the August 2025 version of the SAP is operative or even complete. For example, it omits the basis for Defendants' assumption of 90% power to detect a treatment effect of 3 mg/kg, an amount almost 40% larger than the steroid reduction observed in the Phase 1b/2a trial for Efzofitimod. Defendants relied on this critical fact to contradict Dr. Abrouk's well-founded opinions, but their own version of the SAP provides no explanation for how a treatment effect of 3 mg/kg was reached.

13. Defendants also had access to granular, patient-level data that was unavailable to investors — and they used it to project false confidence. Shukla publicly admitted at multiple investor events that the Company maintained an in-house dashboard capturing patient-level data on steroid curves, lung function,

adverse events, and Patient Global Assessment ("PGA") scores for every enrolled patient. As memorialized in contemporaneous analyst reports, Defendants told analysts that they could see "distinct clustered groups" and "separation and grouping" in the end-of-study steroid-dose distribution, and that management had "line of sight into general trends at end of study, including proportion of patients achieving a full taper." But as Dr. Abrouk explains, and as the failed Phase 3 trial data has confirmed, no meaningful separation between the treatment and placebo arms existed at or around the time of these statements. In his Class Period statements, Shukla specifically admitted to knowing how much OCS each patient was taking during any given day, and that information would allow Defendants to see whether there was separation regardless of whether the data was blinded. Defendants' false claims of separation and clustering projected a confidence in the trial's success that was contradicted by the actual data, and coincided with the late-stage reshuffling of the trial's secondary endpoints to position for a potential FDA Accelerated Approval based on secondary endpoints, once it became clear the primary endpoint would fail. Defendants' presentation from September 30, 2025, proves that no separation or clustering could be observed based on the exact information they earlier claimed to have seen.

14. Defendants' fraud was destined to unravel — and it did, in two stages. First, on September 15, 2025, before the market opened, aTyr issued a press release announcing topline results from the Phase 3 trial. The results were devastating: the study did not meet its primary endpoint of change from baseline in mean daily steroid dose at Week 48. As Shukla himself was forced to concede, "we did not achieve statistical significance as the placebo tapering outperformed even our most aggressive modeling." The data revealed that all three arms achieved similarly large percent reductions in steroid dose — placebo −63.3%, 3 mg/kg −67.8%, and 5 mg/kg − 73.6% — confirming precisely the high placebo response that the Phase 1b/2a trial results had foreshadowed, but which Defendants never adequately disclosed. The

"higher-than-anticipated placebo response" that aTyr blamed for the Phase 3 trial's failure was, in reality, a statistically foreseeable consequence of the underpowered Phase 1b/2a trial, the flawed Phase 3 trial design, and the late-stage endpoint changes that Defendants concealed from the market.

15. The market's reaction was swift and devastating. Upon the announcement that the Phase 3 trial had failed, the price of aTyr's common stock plummeted from a closing price of $6.03 per share on September 12, 2025, to $1.02 per share on September 15, 2025 — a stunning 83% collapse in a single trading day, erasing hundreds of millions of dollars in market capitalization.




16. But the September 15, 2025, disclosure only partially revealed the scope of Defendants' fraud. While it exposed the primary endpoint failure, it did not reveal that the broad population was ill-suited to demonstrate an FVC effect, that monthly dosing might be inadequate, or that the sample size scheme could not support the power Defendants had promised — thereby concealing the risk that the FDA would reject the Phase 3 data as a basis for approval.

17. Additional dimensions of the fraud were revealed in May 2026. On May 11, 2026, aTyr announced that the FDA had rejected the path to approval based on the Phase 3 data and that the Company would need to conduct an entirely new pivotal trial. The FDA directed aTyr to use an FVC primary endpoint in a narrowly defined restrictive-phenotype population with more frequent dosing — directly contradicting Defendants' prior representations that the FDA had "walked the company away from using FVC." The stock declined from $0.95 on May 11 to approximately $0.53 on May 12, 2026, a single-day decline of approximately 44%.




18. Then, on May 15, 2026, aTyr announced its first-quarter results, revealing that the Company's $68.3 million cash position was insufficient to fund the global, 372-patient, 54-week Phase 3 study that the FDA now required. The market priced in the imminent, highly dilutive equity raise. aTyr common stock declined another 10% from approximately $0.56 on May 14 to $0.50 on May 15.




19. The May 2026 disclosures demonstrate that the problems with Efzofitimod were not limited to merely missing a primary endpoint as the previous disclosure showed, but revealed serious, structural problems with the Phase 3 trial, requiring Defendants to go back to the drawing board and conduct an entirely new study.

20. Shukla's subsequent admissions on May 11 and June 25, 2026, that aTyr would need approximately 372 patients and would need to revise its power assumptions to achieve a "slam dunk P-value" so that "there's really no question with regards to the utility of [E]fzofitimod" further confirmed that the original Phase 3 trial lacked the robust statistical margin necessary to reliably succeed. They also corroborate Dr. Abrouk's principal conclusion that aTyr needed far more patients to conduct an adequate clinical study.

21. The failure of the Phase 3 trial — a direct result of Defendants' concealed underpowering of the study, foreseeable from the Phase 1b/2a placebo response, and hidden through a campaign of false and misleading statements — together with the FDA's subsequent rejection of the Phase 3 trial data, directly caused

the devastating stock price decline and investor losses that this action seeks to recover.

## II. JURISDICTION AND VENUE

22. Plaintiffs bring this action, on behalf of themselves and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

23. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

25. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant aTyr is headquartered in this District and a significant portion of its business, actions, omissions, and the subsequent damages to Plaintiffs and the Class took place within this District.

26. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. THE PARTIES

27. As evidenced by their previously filed certifications (ECF Nos. 8-3; 9-2 at pp. 13–34), each Plaintiff purchased aTyr common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

28. aTyr is a Delaware corporation with its principal executive offices located at 10240 Sorrento Valley Road, Suite 300, San Diego, California 92121. During the Class Period, the Company's common stock traded on the Nasdaq stock market (the "NASDAQ") under the symbol "ATYR."

29. Defendant Shukla was, at all relevant times, the President, CEO, and a Director of aTyr. Shukla made many of the materially false and misleading statements at issue in this action at investor conferences, on earnings calls, and through press releases and SEC filings that he signed.

30. Defendant Jill M. Broadfoot ("Broadfoot") was, at all relevant times, the Chief Financial Officer ("CFO") of aTyr. Broadfoot made some of the materially false and misleading statements at issue in this action at investor conferences and through SEC filings that she signed.

31. Defendants Shukla and Broadfoot are sometimes referred to herein as the "Individual Defendants." aTyr and the Individual Defendants are referred to collectively herein as the "Defendants."

32. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of aTyr's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

33. aTyr is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with aTyr's authorization.

34. The scienter of the Individual Defendants, and other employees and agents of the Company, is similarly imputed to aTyr under *respondeat superior* and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. aTyr's Business and Operations

35. aTyr is a very small, clinical-stage biotechnology company that develops new medicines based on how certain enzymes (tRNA synthetases) work in the body. While these enzymes usually help cells make proteins, aTyr focuses on how fragments of these enzymes move outside of cells to control the immune system.

36. aTyr has no approved drugs and does not generate any revenue from commercial products. Instead, aTyr is currently testing these treatments in clinical trials. The Company raises money from investors based on the promise that its experimental drug programs will eventually succeed. aTyr was founded in 2005 and has spent nearly two decades operating as a research-focused company without bringing a product to market.

37. The Company is headquartered in San Diego, California, and operates primarily from a single U.S. location in Sorrento Valley. It had fewer than 60 employees during the Class Period.

38. During the Class Period, aTyr's business depended almost entirely on a single experimental drug: Efzofitimod. The Company had no other late-stage drug candidates capable of offsetting a failure of that program. As a result, aTyr's value in the market rose and fell almost entirely with investor confidence in Efzofitimod and the success of its Phase 3 clinical trial.

### B. The Jefferies ATM Agreement

39. To operate for over twenty years without any product revenue, aTyr raised money by selling investors a small piece of itself in the form of shares. aTyr has different ways to sell shares. One is through a traditional public stock offering.

aTyr has also raised money using a different method called an ATM offering. Each of these helped aTyr raise capital and continue to operate, albeit in different ways.

40. The amount of capital a company can raise from an ATM offering is far more dynamic than from a public offering. An ATM offering is a mechanism by which a company that has already had a traditional public stock offering sells newly issued shares of its common stock directly into the open market at prevailing market prices. Unlike a traditional underwritten public offering, in which the company sells a fixed block of shares to banks at a single negotiated price, an ATM offering permits a company to sell shares incrementally, at its sole discretion, over an extended period. This structure means that the higher the company's stock price in the public market, the more capital the company raises per share sold — creating a direct financial incentive for the company to maintain or inflate its stock price during the period when ATM sales are conducted.

41. In April 2022, aTyr entered into an Open Market Sale Agreement with Jefferies LLC, establishing the Jefferies ATM Offering Program. Under the original agreement, aTyr was authorized to sell up to $65.0 million in shares of its common stock, from time to time and at its sole discretion, through Jefferies acting as sales agent. Jefferies was entitled to a fixed commission rate of up to 3.0% of the gross sales proceeds.

42. Between approximately January 2024 and November 2024, aTyr exhausted this original agreement and sold all $65 million in shares. In December 2024, aTyr amended the agreement and expanded its capacity to $215.0 million. Between January and September 2025, aTyr sold an aggregate of 13,887,177 shares at a weighted-average price of $4.94 per share for net proceeds of approximately $66.4 million. In total, around the Class Period, aTyr raised over $100 million in proceeds through the ATM agreement, about $40 million in 2024 and about $66.4 million in 2025.

**C. Efzofitimod and Pulmonary Sarcoidosis**

43. During the Class Period, aTyr enticed investors by making misleading statements about Efzofitimod's clinical trials, and claiming that the drug could satisfy the unmet need of pulmonary sarcoidosis patients to treat their chronic lung inflammation while tapering off toxic steroids.

44. Pulmonary sarcoidosis is the most common form of sarcoidosis, a family of diseases in which the body's immune system mistakenly stays switched on, even though there is no infection or cancer to fight. The precise trigger is unknown, but doctors believe sarcoidosis begins when a person with a genetic susceptibility is exposed to something common — such as a virus, bacteria, dust, or environmental substance — and the immune system overreacts and never fully shuts down. Instead of turning off, immune cells clump together and form small inflammatory masses, called granulomas. These granulomas can appear in different organs, including the lungs, lymph nodes, skin, eyes, heart, or nervous system.

45. Pulmonary sarcoidosis occurs when these clusters of immune cells form inside the lungs. When that happens, the lungs can become stiff, scarred, and less able to move oxygen into the bloodstream, making it harder for patients to breathe and function normally. Sarcoidosis in the lungs is especially serious because breathing is essential for life. Approximately 160,000 patients are diagnosed with pulmonary sarcoidosis in the United States, with 30,000 new cases diagnosed each year.

46. Pulmonary sarcoidosis follows a highly variable course. In some patients, the disease resolves on its own without the need for treatment. Medical literature estimates that somewhere between 10% and 80% of patients experience spontaneous remission, often within the first few years after diagnosis.

47. However, a subset of pulmonary sarcoidosis patients does not improve and requires long-term management of the inflammation to maintain their quality of

life. Studies show that approximately 10% to 30% of patients develop chronic or progressive pulmonary sarcoidosis.

48. There are no FDA-approved cures for pulmonary sarcoidosis. As a result, pulmonary sarcoidosis patients whose symptoms do not go into spontaneous remission are typically treated with steroids, principally prednisone, to suppress the inflammation. While steroids can control the inflammation and prevent the related symptoms, prolonged use carries serious risks, including diabetes, osteoporosis, weight gain, hypertension, infections, and adrenal suppression. Because there are no FDA-approved therapies or viable alternatives specifically for pulmonary sarcoidosis, many patients remain dependent on toxic steroid regimens for years despite these side effects.

49. Because of the cumulative toxicity of chronic steroid use, the ability to reduce or eliminate steroid use is a clinically meaningful goal in pulmonary sarcoidosis treatment. aTyr's clinical trials for Efzofitimod, its flagship candidate, were intended to reduce steroid usage.

50. Efzofitimod targets a specific protein (NRP2) found on overactive immune cells in the lungs of patients with pulmonary sarcoidosis. By binding to these cells, the drug is intended to suppress inflammatory signals without weakening the patient's overall ability to fight infections. It is delivered to patients through intravenous infusion every month.

**D. FDA Regulatory Framework for Clinical Drug Development**

51. The FDA requires that new drug candidates progress through a multi-phase clinical trial process before they may be approved for marketing.

52. Phase 1 trials test safety, dosing, and pharmacokinetics in a small number of subjects.

53. Phase 2 trials evaluate preliminary efficacy, identify optimal dosing, and assess safety in a larger but still relatively small patient population. Phase 2 trials

are intended to provide Proof of Concept — a technical term for preliminary evidence that the drug may work — and to inform the design of Phase 3 trials.

54. Phase 3 trials are large-scale, pivotal studies designed to provide definitive evidence of efficacy and safety sufficient to support a New Drug Application ("NDA") or Biologics License Application ("BLA").

55. Establishing Proof of Concept in Phase 2 requires more than observing numerical trends in a small trial. According to Dr. Abrouk, the standard of evidence requires statistically significant results or, at minimum, clear and replicable signals across pre-specified endpoints with adequate statistical power. Establishing "dose response" also requires demonstrating a statistically supported relationship between increasing doses and increasing therapeutic effect — mere numerical trends in an underpowered trial do not satisfy this standard.

56. The progression from Phase 2 to Phase 3 is a critical decision point. The FDA conducts "Type C" meetings with drug sponsors to discuss Phase 3 trial design, endpoint selection, and statistical methodology. The Statistical Analysis Plan ("SAP") is a prospectively defined document that prespecifies exactly how trial data will be analyzed, including the primary endpoint, the statistical model to be used, and the assumptions underlying the power calculation. Changes to the SAP during a trial are significant events that can materially affect the risk of a trial's failure.

57. A Data and Safety Monitoring Board ("DSMB") is an independent committee that periodically reviews blinded or unblinded safety data during the conduct of a trial. The DSMB's primary mandate is to ensure patient safety, but it can sometimes provide a sponsor with signals that materially impact the clinical trial. For example, if the drug tested is particularly efficacious and patient need is significant, the DSMB can recommend speeding up the submission for a conditional accelerated approval prior to the conclusion of the clinical trial. The DSMB also reviews whether toxicity levels are acceptable, and determines whether there are compelling reasons to halt the trial early.

**E. The Phase 1b/2a Trial of Efzofitimod in Pulmonary Sarcoidosis**

58. The first clinical trial of Efzofitimod in patients with pulmonary sarcoidosis began on January 29, 2019, enrolled 37 patients, and was completed in June 2021. It was a combined Phase 1b/2a trial — meaning that it was designed not only to monitor safety, but also to look for early signs that the drug might be efficacious and could help patients with pulmonary sarcoidosis.

59. The Phase 1b/2a trial was a randomized, double-blind, placebo-controlled, multiple ascending dose trial. The trial used three dose cohorts (1.0 mg/kg, 3.0 mg/kg, and 5.0 mg/kg) and randomized participants within cohorts 2:1 to Efzofitimod versus placebo.

60. Importantly for investors — and central to the Company's later Phase 3 strategy — the trial utilized a forced steroid taper protocol in which patients' steroid doses were reduced according to a pre-specified schedule to maintain a 5 mg steroid dose, and endpoints included steroid reduction, forced vital capacity ("FVC", a measure of lung function), and patient-reported outcomes such as the King's Sarcoidosis Questionnaire ("KSQ"), fatigue, and dyspnea (shortness of breath).

61. The Phase 1b/2a trial results were published in the peer-reviewed journal CHEST, which found that while the results showed directionality in favor of Efzofitimod across multiple endpoints — including steroid reduction, lung function, and quality-of-life measures — all results were "statistically nonsignificant" and could only be considered "hypothesis generating."

62. In February 2022, following the Phase 1b/2a trial, aTyr engaged the FDA in a Type C meeting to discuss the design of the Phase 3 trial. Based on these discussions, steroid reduction was selected as the primary endpoint for Phase 3.

**F. The Phase 3 Trial Design**

63. The Phase 3 trial tested the same treatment and used the same diagnostic measure as Phase 1b/2a.

64. In September 2022, before the Class Period, the Company began enrollment for a global Phase 3 randomized, double-blind, placebo-controlled study to evaluate the efficacy and safety of Efzofitimod in patients with pulmonary sarcoidosis. The Phase 3 trial was conducted at 91 sites in nine countries: the United States, Brazil, France, Germany, Italy, Japan, the Netherlands, Spain, and the United Kingdom.

65. The trial, which was completed on August 31, 2025, enrolled 268 patients with pulmonary sarcoidosis. Ultimately, 264 dosed patients were randomized 1:1:1 to receive Efzofitimod at 3 mg/kg, Efzofitimod at 5 mg/kg, or placebo, each to be administered as an intravenous infusion every four weeks over a 48-week treatment period (twelve total doses), with a four-week follow-up. According to final data aTyr presented at the ERS Congress 2025, the as-randomized populations were 90 placebo, 86 Efzofitimod 3 mg/kg, and 88 Efzofitimod 5 mg/kg, of whom 80, 76, and 84 patients, respectively, made it through Week 48 of the trial. 28 enrolled patients did not complete the trial.

66. The trial utilized a steroid tapering protocol in which patients began a guided OCS taper to 0 mg OCS in the first 12 weeks, followed by a maintenance period through Week 48 during which patients could remain on their tapered dose or be "rescued" with increased steroids if their disease flared. Tapering decisions were guided by a PGA and Investigator Assessment performed every two weeks. aTyr implemented this steroid-tapering protocol very late in Phase 1b/2a, such that only three patients actually reduced OCS to zero. Introducing this untested variable likely increased the risk of Phase 3 failure.

67. As initially designed and registered on ClinicalTrials.gov, the primary endpoint measured change from baseline in mean daily OCS dose post-taper period (Weeks 12-48); as modified during the Class Period (described below), the primary endpoint measured change from baseline in mean daily OCS dose at Week 48.

### G. Defendants Falsely Claim aTyr Demonstrated "Proof of Concept" for Efzofitimod and Misrepresented That the Phase 1b/2a Trial Showed Efficacy

68. ***Initial Phase 1b/2a Trial Failed to Establish "Efficacy***." As detailed below, throughout the Class Period, Defendants repeated a false claim that the initial Phase 1b/2a trial of Efzofitimod had shown "efficacy." But according to Dr. Abrouk and based on the statistical results of the Phase 1b/2a trial, the steroid-reduction secondary endpoint did not demonstrate efficacy but only a numerically directional advantage in favor of Efzofitimod (mostly the 5 mg dose) against placebo. At the very most, the steroid-reduction secondary endpoint demonstrated directionality in favor of Efzofitimod (mostly 5 mg). This merely means that the steroid-reduction secondary endpoint showed that it may not be futile and that Efzofitimod could continue to be evaluated in larger clinical trials (such as a more robust Phase 2b study). The CHEST study — which Shukla co-authored — found each efficacy endpoint was "statistically nonsignificant" and the results could only be considered "hypothesis generating," directly contradicting Defendants' claims of demonstrated efficacy.

69. ***Defendants Falsely Represented that the Phase 1b/2a Trial Achieved "Proof of Concept".*** Throughout the Class Period, Defendants also repeatedly characterized the Phase 1b/2a trial as providing "Proof of Concept" — a term of art in the biopharmaceutical industry that denotes a robust efficacy signal, typically established in Phase 2b, sufficient to support the design of a pivotal Phase 3 study — showing that "the drug performed brilliantly," and concluding that "Proof of Concept, that's been demonstrated." Defendants' misleading statements about an affirmative Proof of Concept gave investors the false impression that the Phase 1b/2a trial met an efficacy benchmark sufficient to support the design of a pivotal Phase 3 study with a steroid reduction endpoint. But these Proof of Concept representations were doubly false and misleading.

70. ***First***, the primary purpose of Phase 1b/2a was to assess the safety of human consumption of Efzofitimod and to explore preliminary efficacy. While steroid reduction was a secondary endpoint, and FVC, diffusing capacity of the lungs for carbon monoxide ("DLCO"), KSQ-Lung, KSQ-General Health, and the Fatigue Assessment Scale were exploratory endpoints, only the incidence of adverse events ("AE") was a primary endpoint, not efficacy.

71. ***Second***, the only Phase 1b/2a trial endpoint that became the Phase 3 primary endpoint — daily steroid dose — showed numerically weak, exploratory, dose-dependent, and statistically insignificant results in the Phase 1b/2a trial, therefore only generating a steroid dose reduction hypothesis to be tested in further Phase 2 work (such as Phase 2b, which was never done). Moreover, the Phase 1b/2a trial had significant limitations — specifically a lack of statistical significance regarding its steroid reduction endpoint — that Defendants failed to adequately disclose to investors while simultaneously emphasizing the drug's claimed efficacy. The 24.3% dropout rate in the Phase 1b/2a trial was unusually high. The trial enrolled only 37 patients (randomized to four different groups) — far too few to generate statistically reliable conclusions about efficacy. The forced steroid taper was conducted differently than it would be in the later Phase 3 trial, creating comparability issues. *Post hoc* pooled analyses that combined the 3 mg/kg and 5 mg/kg dose groups violated the fundamental biostatistical principle of "analyze as you randomized." The placebo group showed a response pattern that, as Dr. Abrouk explains, foreshadowed the "higher than anticipated placebo response" that ultimately resulted in the failure of the pivotal Phase 3 trial. A high placebo response creates significant risk to a clinical trial because it makes it substantially more difficult to prove the separation required to meet endpoints, and because it suggests that any benefits observed in the treatment arm may not have been caused by the treatment under study.

### H. Defendants Materially Altered the Phase 3 Secondary Endpoints Mid-Trial, But Failed to Adequately Disclose the Implications of the Changes to Investors While Falsely Representing that the Trial Remained "Unmodified"

72. Critically, during the conduct of the trial, key secondary endpoints of Phase 3 were altered. On May 15, 2025, aTyr submitted to ClinicalTrials.gov a material amendment to the NCT05415137 record. That amendment, which was posted on ClinicalTrials.gov as Version 14 on May 20, 2025, modified the trial's Outcome Measures as follows:

a) ***Secondary endpoint removed***. The Version 14 amendment removed the secondary endpoint "Percent change from baseline in mean daily [OCS] dose post-taper" from the protocol. As Dr. Abrouk explains below, removal of this secondary endpoint is material because percent-change is the canonical way to neutralize baseline dose asymmetries between arms — the very asymmetry that, when results were ultimately disclosed on September 15, 2025, revealed that all three arms had achieved similarly large percent reductions (placebo −63.3%; 3 mg/kg −67.8%; 5 mg/kg −73.6%), and that the narrow absolute difference between arms reflected baseline dose asymmetry rather than clinical drug effect. Consequently, a secondary endpoint change during the pendency of the trial can often have detrimental consequences during FDA review of the data, unless a sound rationale is provided and reassurance is convincing enough to the FDA that the sponsor did not make the change after reviewing interim unblinded efficacy data.

b) ***Secondary endpoint additions and modifications***. The amendment added a new categorical secondary endpoint, "Steroid withdrawal rate," with a time frame of "Baseline to Week 48." This binary/categorical endpoint was not part of the trial's original pre-specified outcome measures and produced nominal p-values of 0.1172 (3 mg/kg) and 0.0919 (5 mg/kg) — neither of which reached the conventional 0.05 threshold for statistical significance. The Version 14 amendment further removed a generic "Annual rate of change in absolute value of Forced vital capacity (FVC)" secondary endpoint, and replaced it with "Change from baseline in

absolute value of FVC at Week 48," similarly converting an annualized measure into a single-timepoint Week 48 snapshot; and it added "Change from baseline in KSQ-Lung score at Week 48" with an explicit Week 48 time frame. As Dr. Abrouk explains, adding or modifying a secondary endpoint during a Phase 3 trial is significant. The secondary endpoint change, if not done under blinded conditions, can have a serious negative impact on the scientific validity of the study in the eyes of the FDA. The rationale for this change, made in the middle of an ongoing Phase 3 trial, is crucial for the FDA to buy into its legitimacy. The FDA typically deliberates on such matters during the BLA/NDA submission data review.

73. The May 15, 2025 amendment was the only change to the Outcome Measures on the ClinicalTrials.gov record during the Class Period and was made after the completion of enrollment and after the fourth DSMB review (March 6, 2025), but before the claimed unblinding followed by topline analysis.

74. Despite the materiality of the May 2025 endpoint changes, aTyr's SEC filings during the Class Period did not adequately disclose the impact of these material changes. The Q2 2025 10-Q, in particular, was filed 84 days after the ClinicalTrials.gov posting of Version 14 and yet disclosed neither the material impact from the removal of the "percent change" secondary endpoint nor the addition of the "Steroid withdrawal rate" secondary endpoint.

### I. Defendants Made Objectively False and Misleading Representations Regarding the Phase 3 Trial's Statistical Power and Probability of Success

75. As further described below, throughout the Class Period, Defendants made a series of definitive, factual representations regarding the statistical power of the Phase 3 trial. Specifically, Defendants represented to investors that "the trial is always overpowered" and that it was "powered more than 90% to show either 5 mg/kg of Efzofitimod or 3 mg/kg of Efzofitimod monthly is statistically superior to placebo." These were not mere expressions of corporate optimism; they were

concrete, objective representations of the trial's statistical design and its statistical probability of correctly predicting treatment effect, if one exists.

76. Every clinical trial is governed by two foundational documents. The first is the protocol, which describes the trial's objectives, design, patient population, treatments, endpoints, and statistical methods. The second is the SAP, which specifies, in advance of the commencement of the study and in detail, exactly how the trial's data will be analyzed to determine whether the drug works. The SAP is the rulebook for scoring the trial and how each dose of the drug will be compared to placebo, the size of the difference each comparison is designed to detect, the threshold each comparison must clear to achieve statistical significance, and the number of patients needed to give each comparison a fair chance of success. The SAP exists so that the sponsor cannot change how the game is scored after seeing which side is winning in the interim.

77. The FDA has adopted the International Council for Harmonization's E9 guideline as its own guidance on the statistical conduct of clinical trials. That guidance defines a SAP as "a document that contains a more technical and detailed elaboration of the principal features of the analysis described in the protocol, and includes detailed procedures for executing the statistical analysis of the primary and secondary variables and other data." According to FDA Guidance, the SAP "may be written as a separate document to be completed after finalizing the protocol," and it "should be finalized before breaking the blind." U.S. Food & Drug Admin., *Guidance for Industry: E9 Statistical Principles for Clinical Trials*, Glossary (Sept. 1998) ("FDA E9 Guidance"), § 5.1, at 41.

78. It is unclear whether the SAP Defendants injected into the proceedings when they moved to dismiss the Amended Complaint (ECF No. 27) is the final version or whether there are earlier or subsequent drafts. The SAP was not publicly available during the Class Period. It was disclosed for the first time on July 17, 2026, as an exhibit to Defendants' motion to dismiss the First Amended Complaint (ECF

No. 27-16). Investors therefore had no access to the document that specified the trial's endpoints, statistical method, power assumptions, and multiplicity controls — and no independent way to verify Defendants' representations that the trial was "over 90% powered" or that it would "continue unmodified."

79. Defendants have refused to produce to Plaintiffs anything beyond the single version of the SAP previously attached to their motion to dismiss, and continue to withhold all other related documents, including meeting minutes and correspondence discussing statistical analysis and other SAP versions submitted to the FDA. The SAP that Defendants attached to their motion to dismiss states on every page that it is from August 18, 2025, after virtually all the false and misleading statements were made. Even if the version of the SAP Defendants submitted had some earlier relevance, it does not provide a basis to support their false and misleading statements concerning Phase 3's power. In fact, the SAP version that Defendants submitted contains new, previously undisclosed information, which renders an entirely new category of statements false and misleading when made.

80. The May 15, 2025 "Version 14" amendment changed the primary endpoint from the post-taper measurement window to a Week 48 change-from-baseline endpoint. Defendants did not provide any other information regarding the impact this late change would have on the statistical power of the Phase 3 study. Dr. Abrouk's prior analysis was based on the design and study methodology Defendants posted on ClinicalTrials.gov. Contrary to common practice, and as required by 42 C.F.R. § 11.48(a)(5), Defendants did not upload Phase 3's final protocol and its accompanying SAP.

81. Nevertheless, even the details provided in the SAP version that Defendants filed with the Court confirm that the statistical methodology used weighed the 3 mg/kg and 5 mg/kg arms unevenly, rendering the 3 mg/kg arm severely underpowered based on their chosen SAP's own terms.

82. Defendants' version of the SAP also states that actual power would differ because of the change in primary endpoint, but then asserts that power was recalculated using the same assumptions.[1] However, their version of the SAP does not disclose any revised sample size, or explain how the power was calculated for the changed endpoint. No methods, inputs, or illustrative calculations are provided. Regardless, by the time the primary endpoint was changed, Defendants knew, but failed to disclose, that holding the effect-size, variance, and dropout assumptions constant did not establish that power remained at or above 90%.

83. Dr. Abrouk opines that the Week 48 endpoint change and "alpha-splitting" both show that the trial was not powered anywhere close to the 90% figure Defendants falsely touted during the Class Period (*infra* at ¶¶124-155).

84. The SAP version that Defendants attached to their motion reveals that the trial's 5% overall margin of error was split unevenly between the two Efzofitimod arms. The 5 mg/kg arm received 90% of the allowance, leaving the 3 mg/kg arm with just 10%. According to Dr. Abrouk, this uneven alpha split as disclosed by Defendants' version of the SAP shows that the 3 mg/kg arm's power actually ranged between 25.9% and 45.8%. Under FDA guidelines, splitting the risk across multiple arms requires a corresponding increase in sample size to maintain power[2] — an adjustment Defendants never made. The impact of this lopsided allocation on

---

[1] Statistical Analysis Plan for aTyr1923-C-004, Version 1.0 (18AUG2025) ("SAP") § 2.3.4, at 13 (ECF No. 27-16) ("Actual power for this study will differ due to the decision to use a Mixed Model for Repeated Measures (MMRM) analysis to assess change from baseline to Week 48 (instead of post-taper) and the decision to control Type 1 error for multiple endpoints using alpha-splitting and the graphical approach of Bretz et al. 2009. Given these changes to the primary analysis the study power has been recalculated using the same assumptions for effect size, variance, and dropout. This confirms the study has at least 90% power to achieve a significant effect in at least one arm compared to placebo.")

[2] *See* U.S. Food & Drug Admin., *Multiple Endpoints in Clinical Trials: Guidance for Industry* § III.B, at 8 (Oct. 2022) ("[I]f a lower [alpha] level is used for a study endpoint, then the sample size should be adjusted to provide desired statistical power for this endpoint."); *see also* FDA E9 Guidance § 3.5, at 22.

Defendants' repeated "two shots on goal" misrepresentations is detailed below in Opinion 7.

85. Defendants' claims of 90% power were further rendered false by the known performance of the placebo group in the preceding Phase 1b/2a trial. In that study, the placebo arm achieved a substantial steroid reduction of approximately 46% from baseline, reaching a final mean dose of only 7.2 mg. According to Dr. Abrouk, this high placebo response rate — a fact uniquely within Defendants' possession — made the Version 14 endpoint extraordinarily difficult to achieve. The placebo arm was already capable of significant reduction without the drug, effectively closing the gap and making it mathematically improbable that the trial was "overpowered" as represented.

86. By claiming that the trial was "overpowered" while failing to disclose that the SAP identified two power-changing decisions — the Week 48 endpoint and alpha-splitting — without reporting the recalculated number, Defendants created a false impression of the drug's clinical path. Investors were led to believe the trial was a sure thing statistically, when in reality, the Company was making desperate, mid-trial adjustments to account for a high placebo response that Defendants had already observed in Phase 3 and knew about from the Phase 1b/2a trial.

## V. EXPERT ANALYSIS OF DR. ABROUK, PH.D.

87. Plaintiffs' allegations are informed and corroborated by the biostatistical analysis of Dr. Abrouk, Ph.D., a qualified biostatistician retained by Plaintiffs with more than twenty-five years of experience in biostatistics applied to clinical trials research and development, including designing, analyzing, and reporting Phase I through Phase IV clinical studies of pharmaceutical products. The analysis and opinions set forth in this Section are incorporated into the Complaint as Plaintiffs' factual allegations.

**A. Dr. Abrouk's Qualifications**

88. Dr. Abrouk holds a Ph.D. in Biostatistics (1992) and a Master of Science in Applied Mathematics, both from Michigan State University. He currently serves as Senior Executive Vice President of Biostatistics at Clinical Trials Innovations, LLC in Mountain View, California, where he provides a full spectrum of biostatistics and data management services in support of biopharmaceutical research and development. Dr. Abrouk commonly carries out statistical analyses of clinical trial data (safety, efficacy, quality of life, pharmacokinetics, pharmacodynamics, and post-marketing pharmacovigilance) and specializes in clinical trial study design and statistical data analysis in the context of New Drug Applications (NDA) and Biologics License Applications (BLA) submissions. Dr. Abrouk has also co-authored several NDA and BLA submission materials.

89. Dr. Abrouk was previously a tenured faculty member at Rose-Hulman Institute of Technology, where he developed experimental design and statistical analysis methodology curriculum and founded the Center for Industrial Statistics. He subsequently served as a biostatistician at Parke-Davis/Warner-Lambert (where he worked on Lipitor, Rezulin, Gabapentin, and Neurontin, and conducted post-marketing signal-detection analyses establishing an association between Rezulin and increased hepatotoxicity risk in type 2 diabetics) and at Amgen (where he was part of the team that developed a supplemental NDA for Aranesp). He has served on corporate executive committees and DSMB committees for numerous clinical development programs and has contributed to successful NDA/BLA submissions and late-stage programs across therapeutic areas, including oncology, pain, cardiovascular disease, anemia, diabetes, hepatitis C, Alzheimer's disease, Parkinson's disease, central nervous system disorders, obesity, and non-alcoholic steatohepatitis.

90. For purposes of this matter, Dr. Abrouk has reviewed and analyzed aTyr's publicly released statements pertaining to the design and analysis of its

pulmonary sarcoidosis Phase 1b/2a trial (NCT03824392) and Phase 3 trial (NCT05415137); Defendants' public statements during and before the Class Period, including earnings calls, investor conference transcripts, and press releases; aTyr's SEC filings (Forms 10-K, 10-Q, 8-K, S-3, and 14A); ClinicalTrials.gov records, including the version history of NCT05415137; the CHEST study by Culver et al. reporting the Phase 1b/2a trial results; and related published scientific and statistical literature; the Statistical Analysis Plan for aTyr1923-C-004, Version 1.0 (18AUG2025); aTyr's ERS Congress 2025 presentation; aTyr's post-Phase 3 disclosures, including the May 11, 2026 regulatory and clinical update, the accompanying conference call, and the May 15, 2026 first quarter 2026 results; FDA guidance and related published scientific and statistical literature; and securities analysts' reports.

91. Dr. Abrouk's opinions, based on those materials and set forth in the paragraphs that follow, are pleaded as factual allegations of this Complaint.

**B. Dr. Abrouk's Key Opinions**

92. Based on Dr. Abrouk's analysis, Dr. Abrouk opines:

1) The Phase 1b/2a trial failed to demonstrate "efficacy": The study showed only "directionality" in favor of the drug, which fell far below the 50% steroid reduction threshold considered clinically meaningful in the biopharmaceutical industry.

2) The Phase 1b/2a data did not establish "Proof of Concept": With only 37 patients enrolled and 28 completing the study, the trial was severely underpowered and the results were not even close to being statistically significant; therefore, it did not meet the industry-standard definition of Proof of Concept. It merely generated a numerically weak exploratory dose-dependent hypothesis that should have been tested in a subsequent Phase 2b study prior to launching a pivotal Phase 3 trial.

3) The Phase 1b/2a study did not establish a "dose-response" relationship, but rather generated a numerical exploratory dose-dependent hypothesis to be tested in a further rigorous study: The apparent directionality across the 1 mg, 3 mg, and 5 mg doses was likely the result of random variation in a small sample size and did not satisfy accepted standards for determining a relationship between dose and benefit. It only suggested a numerically weak exploratory dose-dependent hypothesis that should have been tested in a subsequent Phase 2b trial.

4) The Company's *post hoc* pooled analyses of Phase 1b/2a results were scientifically unreliable: By grouping the 3 mg and 5 mg doses after the study was unblinded, Defendants violated the foundational "analyze as you randomized" principle, rendering the results misleading.

5) The Phase 1b/2a placebo response was a red flag for Phase 3's outcome: The significant success of the placebo group in Phase 1b/2a warned that the gap the drug had to bridge was much smaller than assumed — a risk that was known to Defendants but not adequately disclosed.

6) Defendants' representation that the Phase 3 trial was adequately powered was built on unreasonable assumptions and an undisclosed recalculation unsupported by their own data: Because Defendants skipped a standard Phase 2b trial, their design assumptions relied entirely on a tiny Phase 1b/2a pilot study that showed no statistically significant separation from placebo and featured extreme variability. Rather than following FDA guidance to adopt conservative estimates, Defendants assumed a treatment effect and variability that their prior data never produced, resulting in a severely underpowered study that the FDA ultimately forced them to expand.

7) The SAP confirms the 3 mg/kg arm was not a real shot on goal: The test for demonstrating statistical significance for the 3 mg/kg arm was almost ten times more demanding than the test for the 5 mg/kg arm. Defendants did not increase

the number of patients in the 3 mg/kg arm to account for this demanding test, rendering the power of the 3 mg/kg arm well below 50%.

8) Late-stage endpoint reshuffling was designed to obfuscate the trial's failure: The decision to remove, add, and reorder secondary endpoints midway through the trial — combined with CEO Shukla's false public claims about seeing "clustering" and "separation" in the data, which post-Class Period results proved did not exist — indicates that Defendants were aware the primary efficacy endpoint would fail and attempted to position for a potential FDA Accelerated Approval based on secondary endpoints.

**1. Opinion 1: The Phase 1b/2a trial did not show "efficacy."**

93. The Phase 1b/2a trial was designed with a primary endpoint of safety, not efficacy. While the study met its safety goals, the results for the secondary efficacy endpoint — steroid reduction — failed to demonstrate that Efzofitimod actually worked. At most, the data showed a slight numerical advantage or directionality in favor of the 5 mg dose compared to the placebo. In the biopharmaceutical industry, such a finding does not constitute proof of efficacy; it merely suggests that continuing clinical trials is not futile and warrants further, more robust investigation.

94. The study sample size was very limited and too small to allow for any hope of separation from placebo if the drug indeed has a benefit. Single-arm (one-group) Phase 2 trials generally require 20 to 40 patients, but this depends on the therapeutic area. Randomized Phase 2 trials that aim to assess whether the drug has a strong enough benefit to warrant further development (e.g., Phase 3) typically require 100 or more patients. aTyr's Phase 1b/2a trial did not establish an adequate efficacious result to support the claim that the drug has a convincing benefit to patients, in that it randomized a very small number of patients (37) to four groups (12 placebo, 8 in 1 mg, 8 in 3 mg, and 9 in the 5 mg drug dose). This size limitation meant that the statistical potential to separate from placebo (on the primary efficacy measure

of reduction in steroid dose) was not built into the study design. It also meant that the Phase 1b/2a trial was intended solely for an early readout of activity and not serious enough to show the efficacy needed to advance to a robust, well-controlled Phase 3 trial. As described further below, this work is usually done in a later and larger Phase 2b trial, where proof of efficacy and dose selection take place; a study that aTyr never bothered to conduct.

95. *The study experienced a high overall dropout rate*. The reliability of a clinical trial's findings is inextricably linked to the completeness of its dataset. When a patient withdraws from a study before completion, their data for all subsequent visits is lost, creating significant holes in the statistical analysis. While statistical methods exist to address missing data from dropouts, Defendants failed to use such methods in their Phase 1b/2a study given the severe limitation of its sample size and its missing efficacy data due to dropouts. While missing data is a challenge in any trial, it is extremely problematic in a small-scale study like aTyr's Phase 1b/2a trial. Although the Phase 1b/2a trial enrolled 37 patients, it suffered from nine dropouts — a staggering 24.3% attrition rate. Thus, only 28 patients completed the study. In a sample size this small, such a high volume of missing data more likely than not skewed the treatment effect and destroyed the randomization balance, rendering small-subgroup statistical estimates (such as the mean) unreliable and subject to biases from uncontrollable factors that the randomization balance was supposed to even out. This level of information loss jeopardized the validity of the study's findings because the remaining data was no longer representative of the original randomized groups. Mathematically, the missing 24% of data could have completely altered the trial's outcome had it been available.[3]

---

[3] *See, e.g.*, Michaela Kiernan, Michael T. Baiocchi, *Casting New Light on Statistical Power: An Illuminating Analogy and Strategies to Avoid Underpowered Trials*, American Journal of Epidemiology, Volume 191, Issue 8, August 2022, Pages 1500–1507, https://doi.org/10.1093/aje/kwac019; Torres-Saavedra PA, Winter KA, *An Overview of Phase 2 Clinical Trial Designs*. Int J Radiat Oncol Biol Phys. 2022 Jan 1;112(1):22-29. doi: 10.1016/j.ijrobp.2021.07.1700; U.S. Dep't of Health & Hum. Servs., Food & Drug Admin., *Guidance for Industry: E9 Statistical*

96. Because of the small sample size, the variability (or the noise) in the efficacy data was very large in that none of the three drug doses achieved numerical superiority or a statistically significant difference from the placebo (meaning p-value <0.05, a benchmark of statistical significance). This is captured by the error margin around the efficacy estimates (the plus or minus) that is known statistically as 95% confidence intervals. The 95% confidence intervals for all four groups overlapped, indicating that the benefit in reduction of steroid dose, for example, did not differ between the four groups, and although a slight improvement was observed at the 5 mg dose, it came nowhere near numerical superiority, let alone statistical significance.

97. A closer look at the Phase 1b/2a trial's observed results shows that it was plagued by massive noise. For the placebo arm, the Culver *et al.* manuscript reported that participants' steroid usage declined over the course of the study by 45.7%. This decline has a standard deviation that represents nearly half of the entire decline, at ± 26.7%. This excessive noise is commonly measured using the Coefficient of Variation (CV, which is the standard deviation divided by the mean), and a CV of 10% is usually considered indicative of low variability (tight and consistent data). The CV for the placebo arm was 26.7/45.7=55.97%, a highly variable result. Steroid usage similarly declined for the 1 mg/kg arm by 41.4%, with a standard deviation of ± 15.9% (CV = 38.40); for the 3 mg/kg arm by 48.9%, with a standard deviation of ± 19.7% (CV = 40.80); and for the 5 mg/kg arm by -58.1%, with a standard deviation of ± 23.4% (CV = 40.28). All of these reported percent reductions have an excessively high coefficient of variation and overlapping margins of error. The excessive overlap in the steroid reduction across the four arms is what should have raised concern about the drug's efficacy and that an efficacy proof-of-

---

*Principles for Clinical Trials* (Sept. 1998), https://www.fda.gov/media/71336/download ("ICH E9, Statistical Principles for Clinical Trials").

concept has not been achieved in the Phase 1b/2a study, and further rigorous Phase 2b work was required prior to any further development, such as launching a pivotal trial based merely on highly variable and unreliable numerical trends.

98. The overlapping confidence intervals and the excessive noise (variability) further demonstrate that the trial's data cannot reliably distinguish the drug's effect at various doses from one another or, more importantly, from placebo. Confidence intervals are the range of values that are plausible for the true effect of a drug, derived from observed trial data. The wider the confidence interval, the less precise the known estimate of the drug's average effect. Based on publicly reported figures, Dr. Abrouk estimated the 95% confidence intervals for the mean change from Baseline through study end daily steroid dose at Week 24 of the Phase 1b/2a trial for each of the four groups: for the placebo arm, between 4.89 and 9.51 mg in steroid use reduction; for the 1 mg/kg arm, between 5.2 and 8.4 mg in steroid use reduction; for the 3 mg/kg arm, between 3.62 and 9.38 mg in steroid use reduction; and for the 5 mg/kg arm, between 3.13 and 8.07 mg in steroid use reduction.[4] When confidence intervals overlap to this degree, the data cannot reliably distinguish one group from another and fails to demonstrate statistically significant differences. As you compare the range of means for each increasing drug dose, the lowering steroid dependency is equally consistent with a drug effect and with random variation in a small sample. This is why the CHEST authors characterized the findings as "statistically

[4] Dr. Abrouk calculated these confidence intervals using the Phase 1b/2a data in the CHEST manuscript. Because the CHEST manuscript reported standard deviations only for baseline steroid doses and not for the Week 24 values, Dr. Abrouk estimated the Week 24 confidence intervals using a standard statistical approximation known as the Delta Method, applied to the reported baseline standard deviations and the percent-change figures published in Culver et al. The Delta Method is a widely accepted technique for estimating the variability of a transformed quantity from the variability of the original measurement. *See* A.W. van der Vaart, *Asymptotic Statistics* (Cambridge Univ. Press 1998); George Casella & Roger L. Berger, *Statistical Inference* (2d ed. 2002). R software was used to carry out the 95% confidence intervals estimations for the four groups.

nonsignificant" and "hypothesis generating" rather than as evidence of efficacy Proof of Concept.

99. *Phase 1b/2a Results Showed Only "Directionality," Not Efficacy*. The results of the Phase 1b/2a study demonstrated only a nominal difference from placebo, which is not sufficient to support the claim that the clinical trial "showed efficacy." The corresponding reduction (Week 24 relative to baseline) in steroid average dose was 7.2 mg on placebo, 6.8 mg on Efzofitimod 1 mg, 6.5 mg on Efzofitimod 3 mg, and 5.6 mg on Efzofitimod 5 mg. Thus, the differences in drug doses (1 mg, 3 mg, and 5 mg) from placebo were 0, −0.4, −0.7, and −1.6 mg, respectively. These observed differences are insignificant and indicate that only slight directionality was shown in the Phase 1b/2a trial.

100. In fact, studies often use the steroid-reduction success criterion of a reduction of at least 30% to 50% in the daily dose, or a reduction of at least 10 mg/day when using steroid-sparing interventions.[5] But the Phase 1b/2a trial showed a reduction in steroid dose relative to placebo of only 5.6%, 9.7% and 22.2% on the 1 mg, 3 mg, and 5 mg Efzofitimod doses, respectively.

101. These very small differences do not amount to anything other than a mere directional trend or insignificant numerical advantage in favor of the drug, but marginal at best, and do not qualify as enabling a sponsor to advance to a larger Phase 3 trial. Dr. Abrouk explains that a "numerical advantage" simply means that the drug achieved a slight benefit over placebo and is by no means a "robust enough efficacy result." Commonly, what comes after uncovering a numerical advantage or numerically beneficial result is to next design a more rigorous Phase 2b trial to demonstrate Proof of Concept and later pave the way for a more adequate Phase 3

[5] *See* Friedman MA, Le B, Stevens J, Desmarais J, et al., *Tofacitinib as a Steroid-Sparing Therapy in Pulmonary Sarcoidosis, an Open-Label Prospective Proof-of-Concept Study*, Lung 199:147–153 (2021), doi:10.1007/s00408-021-00436-8.

trial with much higher chances for success,[6] rather than the rushed and failed Phase 3 trial in the instant matter, which was designed on findings of minor directionality rather than statistically significant Phase 1b/2a results that are clinically meaningful.

102. *The Failure to Conduct a Powered Phase 2b Proof of Concept Study*. Dr. Abrouk explains that to demonstrate efficacy, a convincing level of separation from placebo is required, one that is both numerically superior and clinically meaningful. In a Phase 2b trial, which aTyr did not conduct, it is commonly expected that Proof of Concept (with statistical significance) and a clinically convincing benefit be established to allow for the chance of a successful Phase 3 pivotal trial. According to Dr. Abrouk, some trials can advance to Phase 3 even if the Phase 2b results do not demonstrate statistical significance. But the clinical magnitude of the effect size (delta between the active arm and placebo) must be clinically impressive, which the aTyr Phase 1b/2a trial results definitively were not. It is generally imprudent to jump immediately from a Phase 1b/2a study to a Phase 3 trial when, as here, the trends do not show numerical superiority but only minor directionality.

103. The following are generally required for a successful transition from Phase 2 to a properly designed Phase 3 trial:

a) Clear separation from placebo accompanied by statistical significance or at least with small enough error margins that distinguish convincingly enough from a placebo response. This benefit is called "the effect size" and is usually expressed as a percentage (for example, the drug showed a 30% reduction in steroid doses compared to placebo). A significant effect size is required to adequately power a Phase 3 trial;

---

[6] *See* Li QH, Deng Q, Ting N. *Proof of Concept: Drug Selection? Or Dose Selection? Thoughts on Multiplicity Issues*. Ther. Innov. Regul. Sci. 2021 Sep;55(5):1001-1005. doi: 10.1007/s43441-021-00299-4.

b) The dose or doses are deemed efficacious enough in a Phase 2 trial to advance to a Phase 3 trial. This is referred to as "dose ranging" and is usually a good sign that there is an efficacy relationship to the drug dose amount; and

c) An acceptable enough safety profile to merit a larger Phase 3 study and provide a reasonable benefit/risk ratio of the drug.

104. ***aTyr Bypassed Critical Safeguards, Creating a Foreseeable Phase 3 Failure***. aTyr launched the Phase 3 trial based solely on the results of the Phase 1b/2a study and did not conduct an adequately powered Phase 2b to demonstrate Proof of Concept. The risk of failure aTyr built into the Phase 3 trial was high and obvious by design because the Phase 1b/2a trial failed to achieve the following crucial elements:

a) ***The Unconventional Decision to Skip Phase 2b Dose-Ranging Studies***. aTyr carried forward Efzofitimod 3 mg (n=8) and 5 mg (n=9) doses (against placebo (n=12)) based solely on Phase 1b/2a's minor directionality in steroid dose reduction. aTyr marched forward from Phase 1b/2a to Phase 3 without a primary efficacy endpoint that was either statistically significant or clinically meaningful. By skipping the crucially important Phase 2b work necessary to inform the design of the Phase 3 trial, aTyr introduced a built-in risk of failure into the Phase 3 trial. In Dr. Abrouk's experience and based on established industry norms he is aware of, it is highly unconventional to initiate a large-scale, pivotal Phase 3 trial as aTyr did based only on a sample size as small as 9 patients in a single-dose group (i.e., the Efzofitimod 5 mg dose). Standard clinical practice typically requires a robust signal — meaning data that is both statistically significant and clinically consistent — to justify the massive capital expenditure and patient risk associated with a properly designed Phase 3 trial. Dr. Abrouk states that, by rushing to Phase 3 without first conducting a Phase 2b dose-ranging trial to confirm efficacy, aTyr deviated from the rigorous biostatistical protocols used by reasonable practitioners to power a clinical trial to correctly predict the treatment effect. From a clinical development standpoint, aTyr's decision to move forward with such a limited data set created a high

probability of failure that was foreseeable under industry-standard analysis of how clinical trials are powered.

b) ***The Absence of a Statistically Significant Effect Size Impeded Accurate Powering***. The Phase 3 trial's power was adversely affected because a robust enough efficacy signal (either statistically significant or clinically meaningful) in the Phase 1b/2a trial was lacking. Dr. Abrouk states that to adequately power a randomized controlled trial, such as comparing the 5 mg to placebo based on the change in steroid dose from baseline to Week 48, aTyr was required to have already achieved (in Phase 2) an efficacy effect size (i.e., an efficacy signal that is large enough to be clinically meaningful and that achieves statistical significance ($p<0.05$)) or close to statistical significance. aTyr did not have such an efficacy effect size.

c) ***aTyr Deviated from Industry Practice by Omitting Mid-Trial Futility Data***. Dr. Abrouk explains further that aTyr deviated from standard industry practice by failing to conduct — or at least failing to disclose — a futility analysis at some intermediate point during the Phase 3 trial.[7] In high-stakes drug development, companies typically have an independent board (the DSMB) review the data halfway through to see if the drug is actually outperforming the placebo.[8] If the drug shows no sign of working, the trial is stopped on futility grounds to protect patients and investors. Instead, based on Dr. Abrouk's review of the available record, aTyr represented that the DSMB had reviewed the trial four separate times and recommended that it "continue unmodified." However, aTyr only disclosed that the trial was safe; it remained silent on whether the DSMB evaluated any evidence of efficacy. By claiming the DSMB's all-clear recommendations without disclosing whether a futility analysis was ever performed, aTyr created a false sense of security.

[7] *See* Comm. for Medicinal Prods. for Human Use (CHMP), *Guideline on Data Monitoring Committees*, Doc. Ref. EMEA/CHMP/EWP/5872/03 Corr (Eur. Meds. Agency July 27, 2005).

[8] *See* ICH E9, *Statistical Principles for Clinical Trials*, https://www.fda.gov/media /71336/download.

This led investors to believe that the trial was on track for success, when in reality, the trial had a high risk of failure that a standard mid-stream review likely would have predicted.

105. ***Bases for Opinion 1***. In forming the opinions expressed above, along with the available information about aTyr's clinical trials, Dr. Abrouk relied on the following sources: (i) the EMA Guideline on Data Monitoring Committees, a common strategy employed and approved by regulatory authorities;[9] (ii) the FDA Guidance for Industry E9 Statistical Principles for Clinical Trials;[10] (iii) the FDA clinical trials phases definitions, which outline the FDA's expectations of clinical trials by phase;[11] (iv) the Phase 2b efficacy Proof of Concept manuscript (NIH): Proof of Concept: Drug Selection? Or Dose Selection? Thoughts on Multiplicity Issues;[12] and (v) the Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products.[13]

**2. Opinion 2: The Phase 1b/2a results did not establish "Proof of Concept."**

106. According to Dr. Abrouk, Proof of Concept is a term of art in the biopharmaceutical industry. In early research, one aims to characterize what the drug does to the body (dynamics) and how the body metabolizes the drug (kinetics), and a Proof of Concept in this context would be referred to as a "kinetics-dynamics Proof of Concept." For efficacy, Proof of Concept requires establishing (usually in

---

[9] *See* Comm. for Medicinal Prods. for Human Use (CHMP), *Guideline on Data Monitoring Committees,* Doc. Ref. EMEA/CHMP/EWP/5872/03 Corr (Eur. Meds. Agency July 27, 2005).

[10] *See* ICH E9, *Statistical Principles for Clinical Trials*, https://www.fda.gov/media /71336/download.

[11] *See* FDA clinical trials phases definitions, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

[12] *See* Li QH, Deng Q, Ting N. *Proof of Concept: Drug Selection? Or Dose Selection? Thoughts on Multiplicity Issues*. Ther. Innov. Regul. Sci. 2021 Sep;55(5):1001-1005. doi: 10.1007/s43441-021-00299-4.

[13] *See,* Food & Drug Admin., *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (May 1998).

Phase 2b) a robust signal (difference between drug and placebo) that is large enough to represent a meaningful and impressive clinical benefit that is statistically significant (p<0.05 or very close to it).

107. Thus, Dr. Abrouk elaborates that, when a sponsor like aTyr affirmatively represents that a Phase 1b/2a trial established Proof of Concept, it is understood in the biopharmaceutical industry to mean that there is a convincing enough efficacy separation from the placebo. This separation is measured by the effect size — the delta between the active drug and the placebo — which must be clinically meaningful and, ideally, statistically significant. Dr. Abrouk states that, in professional drug development, it is standard practice for a sponsor to halt a program or refrain from launching a Phase 3 trial if earlier clinical trials do not achieve statistical significance (p<0.05) or come close to that threshold. While sponsors may occasionally proceed without statistical significance if the clinical magnitude of the effect is exceptionally impressive, proceeding based only on minor directionality, as aTyr did here, is considered imprudent and is heavily frowned upon within the industry.

108. While the FDA generally may not prevent a sponsor from advancing a drug candidate if safety has been sufficiently established, the agency's lack of an "efficacy block" does not excuse a sponsor from its duty to follow rigorous development protocols. In Dr. Abrouk's expert opinion, it is a serious departure from the norm for a sponsor to transition from the minor directionality of a small Phase 1b/2a safety study directly into a pivotal Phase 3 trial. By bypassing the Phase 2b stage, aTyr failed to mitigate the high risk of failure that is inherent in early-stage data.

109. According to Dr. Abrouk, "directionality" is another term of art used in the biopharmaceutical industry, which means a non-impressive improvement over placebo that is not clinically meaningful or statistically robust, but simply an observation of a minor benefit that requires further investigation in a Phase 2b trial,

usually larger than the Phase 1b/2a trial and statistically powered to establish Proof of Concept.

110. A drug effect, even in a directionally positive manner, does not establish Proof of Concept. Instead, to establish Proof of Concept, a study needs to have a prespecified efficacy endpoint, demonstrate a meaningful benefit (effect size), and show that the difference between the treatment and placebo arms is statistically significant or very close to being so.[14]

111. Dr. Abrouk states that here, with only 37 patients, the Phase 1b/2a trial was severely underpowered. He also observes that the directionality in steroid reduction, lung function, and quality-of-life measures was not statistically significant. The confidence intervals were excessively wide, meaning the data was consistent with both a meaningful treatment effect and no effect at all. The unusually high dropout rate in a small 37-patient trial meant that an even smaller number of patients completed the study, further reducing the reliability of any observed trends that aTyr misleadingly claimed. By accepted biostatistical standards, non-significant trends in a 37-patient trial do not constitute an efficacy Proof of Concept, but rather a numerical dose-dependent exploratory hypothesis that requires rigorous testing in a further Phase 2b study (which the Defendants skipped altogether). Accordingly, aTyr's repeated mischaracterization of the Phase 1b/2a trial results as Proof of Concept was inconsistent with the actual data and how that term of art is understood in the biopharmaceutical industry.

112. The CHEST study did not find otherwise. The CHEST study never stated, and cannot reasonably be interpreted as suggesting, that the Phase 1b/2a trial

---

[14] *See, e.g.*, Li QH, Deng Q, Ting N. *Proof of Concept: Drug Selection? Or Dose Selection? Thoughts on Multiplicity Issues*. Ther. Innov. Regul. Sci. 2021 Sep;55(5):1001-1005. doi: 10.1007/s43441-021-00299-4; Food & Drug Admin., *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (May 1998), https://www.fda.gov/files/drugs/published/Providing-Clinical-Evidence-of-Effectiveness-for-Human-Drug-and-Biological-Products.pdf.

established efficacy or Proof of Concept. Instead, the authors of the CHEST study observed that the Phase 1b/2a trial showed mere "directionality":

> The major limitation of this study is the small sample size, and as such the results will need to be confirmed in a larger study. Operational site difficulties imposed by the COVID-19 pandemic accounted for most of the dropouts. Because of the size, baseline imbalances were present for several of the key endpoints and the CIs are fairly wide, which limits our ability to draw firm conclusions. However, statistical analyses when adjusted for baseline value demonstrated that the major endpoints exhibited directionality in favor of a beneficial effect of efzofitimod, suggesting that a larger sample may solidify the findings. We also acknowledge that statistical adjustment for multiple hypothesis testing and power analysis were not performed because of the exploratory nature of the study.15

**3. Opinion 3: The Phase 1b/2a results did not demonstrate "dose response," but rather generated a numerical exploratory dose-dependent hypothesis to be tested in a rigorous further study.**

113. Dr. Abrouk explains that "dose response" is another term of art in the industry aimed at determining the relationship between a given drug's doses and their corresponding efficacy (clinical benefit) as it relates to toxicity (adverse events). This step is required and necessary to inform the Phase 3 study about the minimum effective dose and the maximum tolerated dose.[16]

114. The FDA insists on dose-response work at this stage because "[c]onducting dose-response studies at an early stage of clinical development may reduce the number of failed Phase 3 trials," *id*. § III.A, and because early dose-ranging studies are prudent "in order to avoid failed Phase 3 studies," *id.* § IV.3. This is the exact risk that materialized for Defendants.

---

[15] Daniel A. Culver et al., *Efzofitimod for the Treatment of Pulmonary Sarcoidosis*, 163 CHEST 881 (2022).

[16] *See* Naitee Ting & Qiqi Deng, *Phase I/II Clinical Trial Design and Dose Finding* (May 5, 2017) (presentation slides, Stanford Center for Innovative Study Design), https://med.stanford.edu/content/dam/sm/cisd/documents/Stanford-phase-I-II-DF-methodology-slides.pdf; Food & Drug Admin., *Guideline for Industry: Dose-Response Information to Support Drug Registration*, ICH-E4 (Nov. 1994), https://www.fda.gov/media/71279/download.

115. According to FDA ICH-E4, Section B.1 (Parallel Dose-Response), dose response requires two elements. First, a statistically significant trend where a drug's benefit increases with higher doses: "being able to detect a statistically significant difference in pair-wise comparisons between doses is not necessary if a statistically significant trend (upward slope) across doses can be established using all the data." *Id*. at 11. In addition, a second element is required: "It should be demonstrated, however, that the lowest dose(s) tested, if it is to be recommended, has a statistically significant and clinically meaningful effect." *Id*. The guidance therefore permits a significant trend where increasing doses show increasing effectiveness generally, instead of requiring that each dose show statistical significance, but it critically requires the lowest recommended dose to show a statistically significant and clinically meaningful effect.[17]

116. None of the three doses tested in Phase 1b/2a — 1 mg/kg, 3 mg/kg, or 5 mg/kg — achieved a statistically significant effect, so the second element that the FDA recommends was not met at any dose.

117. In terms of the first element, the minor directionality in Phase 1b/2a outcomes suggests that with increasing dose (1 mg/kg, 3 mg/kg, 5 mg/kg) there was a modest but not statistically significant increase in steroid reduction. Such an insignificant change did not satisfy accepted standards for establishing a dose-response relationship.[18] In a trial with only approximately 8-12 patients per arm, apparent dose-response directionality can arise from random variation alone. The authors of the CHEST study (Culver et al.) themselves did not characterize the data as establishing a dose response.

---

[17] *See* Food & Drug Admin., *Guideline for Industry: Dose-Response Information to Support Drug Registration*, ICH-E4, at 2 (Nov. 1994), https://www.fda.gov/media/71279/download.

[18] *Id*.

**4. Opinion 4: The *post hoc* pooled analyses violated the fundamental analyze as you randomized experiment principle.**

118. aTyr publicly presented *post hoc* analyses that pooled the two higher-dose groups (3 mg/kg and 5 mg/kg) and compared them to the sub-therapeutic dose group. These *post hoc* pooled analyses were presented to investors as evidence of efficacy, including a Kaplan-Meier analysis of time to first relapse and an "ultra responder" analysis. However, according to Dr. Abrouk, pooling dose groups after unblinding violates the foundational biostatistical principle of "analyze as you randomized." In Dr. Abrouk's expert opinion, aTyr's public reliance on *post hoc* analyses — such as the "time to discontinuation of steroids" — to claim statistical significance was scientifically indefensible and misleading. Specifically, these analyses suffer from two fundamental flaws that render them statistically suspect and unreliable.

119. ***The Fallacy of Post Hoc "Data Dredging."*** First, the analysis in question was not pre-specified in the study protocol or the SAP. FDA Guidance for Industry E9 supplies the applicable regulatory standard: "Only results from analyses envisaged in the protocol (including amendments) can be regarded as confirmatory." E9 further explains that post hoc exploratory analyses may generate hypotheses but cannot provide the same reliable basis for a conclusion of efficacy. By aTyr's own admission, this analysis was conceived only *after* the data was unblinded. In clinical research, this is often referred to as "data dredging" or "cherry-picking." When a sponsor searches through unblinded data to find any positive trend among a sea of unfavorable results, the resulting "statistical significance" is often a random mathematical fluke — a "red herring" — rather than evidence of a true drug effect. aTyr failed to disclose that this analysis lacked the rigorous controls of a pre-specified endpoint, instead presenting it to investors as a high-value finding of efficacy.

120. ***Violation of the Analyze as You Randomized Principle.*** The validity of a randomized controlled trial depends entirely on maintaining the integrity of the randomized groups. aTyr's analysis violated this foundational principle of

experimental design by pooling or lumping the placebo group with the 1 mg Efzofitimod dose group. By design, the study consisted of four distinct arms: placebo, 1 mg, 3 mg, and 5 mg.

121. Arbitrarily regrouping patients after the study is complete to create a more favorable comparison is a major statistical irregularity. Such pooled analyses carry virtually no weight in the eyes of regulatory bodies like the FDA because they bypass the original trial design. aTyr's failure to disclose these irregularities deprived investors of the context necessary to understand that these "results" were a manufactured statistical byproduct, not a legitimate clinical victory.

**5. Opinion 5: The Phase 1b/2a placebo response made aTyr aware of the need to adequately power the Phase 3 trial.**

122. In the Phase 1b/2a trial, Dr. Abrouk notes that the placebo group showed a meaningful ability to taper steroids, indicating that steroid reduction in pulmonary sarcoidosis patients is achievable even without active drug — likely because many patients were overtreated with steroids. This placebo response pattern was a warning sign that the Phase 3 trial would face a high placebo response, which would narrow the treatment difference between Efzofitimod and placebo and reduce the likelihood of achieving statistical significance. This risk was known to Defendants from their own claimed understanding of the Phase 1b/2a trial results and was never adequately disclosed.

123. The placebo arm reduced steroid use by approximately 46% from baseline, meaning that patients in the study who received no drug still made it nearly halfway toward a goal of complete steroid independence.[19] This placebo response pattern was a warning sign that the Phase 3 trial would face a high placebo response,

[19] The approximately 46% figure is calculated from the published Phase 1b/2a results reported in Culver et al., CHEST (2022). The placebo group's mean baseline daily steroid dose was 13.3 mg (with a standard deviation of 4.4 mg). At Week 24, the placebo group's mean daily dose had fallen to 7.2 mg — a reduction of 6.1 mg, or approximately 46% of the baseline dose of 13.3 mg. This reduction occurred in the group receiving no drug, reflecting the steroid-tapering protocol built into the trial design.

which would narrow the treatment difference between Efzofitimod and placebo. The placebo group did so well on their own — cutting their steroid use by nearly half — that it left almost no room for the drug to look better. To prove the drug actually worked, it needed to beat that massive 46% placebo drop by achieving more than a 50% reduction (*infra* at ¶180). When the placebo group improves that much, the gap between the drug and the placebo shrinks to almost nothing. That shrinking gap destroys the trial's mathematical power, meaning the study was virtually guaranteed to fail to show a meaningful difference even if the drug had some benefit. This risk was known to Defendants from their own claimed understanding of the Phase 1b/2a trial results and was never adequately disclosed.

**6. Opinion 6: The Phase 3 Power Representation Rested on An Assumed Treatment Effect Defendants' Own Data Had Never Produced and on an Undisclosed Recalculation.**

124. ***Statistical Power and Its Importance***. "Statistical power" is the probability that a clinical trial will be able to detect a real difference between the drug and the placebo, when a "real" difference actually exists — in other words, the trial's ability to produce a statistically significant, clear, reliable answer about whether the drug works. A trial with high power (*e.g.*, 90%) is very likely to detect a genuine drug effect if one exists (and if the trial is properly conducted and executed); a trial with low power may miss that effect entirely, producing an inconclusive result even if the drug is beneficial; this is what is commonly known as a "false negative." Phase 2b clinical trials are usually powered at 80%, and Phase 3 clinical trials are usually powered at 90%.[20]

125. Statistical power is critical to successful clinical trials because, without it, the sponsor cannot adequately test an efficacy hypothesis and cannot separate placebo from drug to obtain a reliable enough signal or Proof of Concept. Without statistical power, a sponsor can only run an exploratory estimation of preliminary

[20] ICH E9, *Statistical Principles for Clinical Trials*, https://www.fda.gov/media/71336/download.

activity or efficacy and aim to generate a hypothesis to be tested in later studies. Comparative clinical studies that are not statistically powered do not carry much weight and are universally viewed by the FDA and the biopharmaceutical industry as only preliminary findings that require significant further investigation in a future powered study setting.

126. Defendants discussed in conference calls the assumptions on which the Phase 3 trial sample-size calculation was based. Defendants stated that the 5 mg/kg dose in the Phase 3 trial was powered on an assumed treatment effect of 3 and an assumed standard deviation of 6, yielding an enrollment of 88 patients per arm.[21] Those assumptions were the foundation of the greater-than-90% power statement.

127. However, the only clinical data Defendants possessed concerning Efzofitimod was the Phase 1b/2a study. That study enrolled 9 patients in the 5 mg/kg arm. Any assumption Defendants made about the effect size or the variance to be expected in Phase 3 was therefore an extrapolation from the Phase 1b/2a data and could be justified only by what that data actually showed.

128. According to Dr. Abrouk, the Phase 1b/2a data did not support Defendants' assumptions. In that study, Efzofitimod did not separate from placebo to a statistically significant degree, and the small number of patients enrolled in Phase 1b/2a made the observed results highly variable, unreliable, and did not support any separation from placebo as it only produced a mere numerical trend with poor precision (highly noisy results). *See* supra ¶¶93-105. The confidence intervals, or the ranges within which each arm's result was likely to fall, included a range that

[21] *See* Transcript, aTyr Pharma Inc. Q3 2022 Earnings Call (Nov. 10, 2022) (Shukla: "We have 264 patients, 3 dose arms . . . each arm is 88 patients. We powered this trial over 90% — 92% to be exact . . . an absolute reduction of somewhere between 2.5 milligrams to 3 milligrams difference."); SAP § 2.3.4, at 13 ("The assumed common within-group standard deviation is 6 mg/day."); *see also* Cantor Fitzgerald, *aTyr Pharma, Inc. (ATYR): Some Important Updates Relevant for P3 Pulmonary Sarcoidosis* (Mar. 13, 2025) ("Trial is well powered to show absolute steroid reduction of 3 mg/day vs. placebo. Management assumed a standard deviation (SD) of 6.").

covered zero and even the possibility that the drug performed *worse* than placebo. Data consistent with the drug having no effect at all cannot support a design assumption that the drug would cut steroid use in half in Phase 3.

129. For this reason, Dr. Abrouk reaffirms that Defendants' disclosed assumptions were unreasonable and unreliable when made and had no legitimate basis in the data they possessed. FDA guidance requires a sponsor to ground its sample size assumptions, including the assumed variability of the data and the size of the treatment effect it expects to detect, in "published data or on results of earlier trials," and to state that basis in the protocol. *See* ICH E9, Statistical Principles for Clinical Trials § 3.5.[22] Because early-phase results tend to overstate a drug's true effect, the same guidance requires sponsors to test how sensitive the trial's size is to errors in those assumptions, and accepted practice requires sponsors to err on the side of caution, assuming a smaller treatment effect and greater variability than the early data showed. *Id.*

130. Defendants did the opposite. Their own Phase 1b/2a data supported a standard deviation of 6.22 and a treatment effect of 2.2. Rather than adopt those figures and perhaps reduce the risk of failure in the pivotal study, Defendants assumed a standard deviation of 6 and a treatment effect of 3. In other words, Defendants assumed their data would be less variable than their prior trial showed, and their drug's effect nearly 40% larger than their prior trial demonstrated. aTyr failed to recognize that the sample size limitation in the Phase 1b/2a trial rendered its estimates unreliable and extremely noisy at best.

131. Dr. Abrouk followed biostatistical industry standards and FDA guidance and applied the correct method to the Phase 1b/2a results. Extrapolating from the data Defendants actually generated, and adjusting as accepted practice requires, the appropriate design assumptions were an effect of 2.2 and a standard deviation of 6.22, which require 170 patients per arm to reach statistical significance

[22] https://www.fda.gov/media/71336/download

with 90% power, much more than Defendants enrolled. Dr. Abrouk's calculations were performed and independently confirmed across three separate statistical software packages.

132. Defendants' assumptions were therefore unreasonable when made and lacked any basis in the data Defendants possessed. As Dr. Abrouk explains, a hypothetical change in the assumed effect from −6 to −5.51 mg per day reduces the drug versus placebo differences from 3 to 2.51, under 10%, and raises the required total number of patients from 264 to 369. Defendants, on the other hand, enrolled only 268 patients in total, and therefore the Phase 3 study was not powered anywhere close to the false figure of 90% stated to investors.

133. Defendants' publicly-stated expectation that variability would be lower at the end of the Phase 3 trial, which would increase statistical power, is similarly unreasonable and lacks basis. Before launching the Phase 3 trial, Defendants tested Efzofitimod in only one clinical study, which was a Phase 1b/2a trial of 37 patients distributed across multiple arms. The 5 mg/kg arm on which Phase 3's design assumptions were based enrolled only 9 patients. Its results were highly variable, and they did not provide a reliable estimate of either the treatment effect or the variability that a pivotal Phase 3 trial would need to be adequately powered.

134. Nor could a study as small as the Phase 1b/2a trial reliably predict how outcomes would vary in a 268-patient Phase 3 trial. As a matter of accepted statistical practice,[23] 9 patients cannot provide adequate information about the reasonably expected variability observed in a Phase 3 trial of 268 patients. The smaller the sample, the higher the likelihood that any observed variance reflects sampling noise instead of any reliable conclusion about the drug's efficacy. Defendants' projection was a prediction about how a 268-person trial would behave at Week 48 based on data from a much smaller study (37 patients in total divided among 4 groups) in which none of the three treatment arms meaningfully separated from placebo.

[23] *See* ICH E9, *Statistical Principles for Clinical Trials* § 3.5.

Defendants therefore had no statistical basis to project that variability at Week 48 of the Phase 3 trial would be *lower* than what their own Phase 1b/2a data had shown. Defendants skipped the standard Phase 2b study commonly used to derive a reliable efficacy estimate (typically at least 100 patients), and because they neglected to do this essential work to inform the pivotal trial, the risk that the Phase 3 trial would fail materially increased.

135. Generating reliable effect-size and variability estimates for Phase 3 planning is the ordinary function of a Phase 2b trial, the step Defendants skipped. Having skipped it, Defendants lacked the data needed to reliably power the Phase 3 trial, and lacked any credible basis to tell investors the Phase 3 trial was adequately powered to detect the treatment effect they had assumed.

136. In fact, on May 11, 2026, Defendants announced that the FDA would require aTyr to conduct a new Phase 3 trial with 372 patients before Defendants could resubmit the BLA. The new Phase 3 study is approximately 40% larger than the 268-patient study Defendants had represented as adequately powered. This post-Class Period event further corroborates Dr. Abrouk's opinions that a much larger study sample was needed to adequately power the trial, that the Phase 3 study could not reliably detect a treatment effect, and that Defendants' assumption of lower variability was unsupported when made.

**7. Opinion 7: The SAP Confirms the 3 mg/kg Arm Was Not a Real Shot on Goal.**

137. Both before and during the Class Period, Defendants repeatedly told investors they had two independent chances of hitting statistical significance and proving efficacy in either the 3 mg/kg or 5 mg/kg dose cohort. But the SAP they now claim controlled during the Class Period demonstrates that the 3 mg/kg arm never provided any opportunity to demonstrate efficacy.

138. The 3 mg/kg dose in the Phase 3 study was underpowered by design and the notion that there were two shots on goal is unsupported. First, in order for the 3 mg/kg dose to be adequately powered (90%) at the 5% significance level and with

the SAP assumption regarding its expected efficacy (mean reduction in steroid use of 3 mg and a standard deviation of 6 mg), 191 randomized patients would have been necessary to enroll on the 3 mg/kg arm and 191 patients on placebo.[24] aTyr's sample size for the 3 mg/kg dose in Phase 3 was only 88 patients. Second, aTyr failed to utilize another design option in order to claim that the 3 mg/kg dose was also powered for efficacy at the 90% level. This option was to use an alpha split at the design stage such as a significance level of 2.5% for each of the two arms (3 mg/kg and 5 mg/kg). This would have then required 101 randomized patients on the 5 mg/kg dose and 225 randomized patients on the 3 mg/kg dose. aTyr's sample size for the 3 mg/kg dose in Phase 3 was only 88 patients.

139. Drug sponsors, prior to database lock and unblinding, can assign alpha evenly or unevenly between the arms (a practice commonly known as "alpha splitting"). If a sponsor chooses to split the alpha unevenly, a treatment arm that receives a smaller share of alpha must produce a smaller p-value, and therefore a much stronger result, to be declared statistically significant. The alpha split identified in Defendants' version of the SAP demonstrates that the 3 mg/kg arm was required to clear a significance threshold almost ten times more demanding than the threshold for the 5 mg/kg arm, while being designed around a much smaller treatment effect.

140. The amount of alpha assigned to a treatment arm directly affects that arm's statistical power, meaning its likelihood of producing a statistically significant result. FDA guidance explains that "[t]he study power is the probability that the study will be successful if a treatment effect of a specified size is in fact present," and that "[t]he ***desired power is an important factor in determining the sample size, especially for the primary endpoints***." U.S. Food & Drug Admin., Multiple

[24] The power calculations in this paragraph were derived using the R software package "pwr" (R: A language and Environment for Statistical Computing, Vienna, Austria 2025, https://www.R-project.org/).

Endpoints in Clinical Trials: Guidance for the Industry (Oct. 2022) ("FDA Multiple Endpoints Guidance") § III.B, at 8.

141. The four inputs that determine power are: (1) the alpha allocated, (2) the size of the treatment difference designed to detect, (3) the expected variability of the data, and (4) the number of patients in each arm, and the randomization allocation ratio between treatment arms. Holding variability and patient numbers constant, a comparison that is allocated a smaller alpha, as the 3 mg/kg arm was here, or that is designed to detect a smaller difference, by definition has less power. FDA guidance is explicit that a sponsor must compensate for a reduced alpha with more patients if it wants to preserve power: "if a lower [alpha] level is used for a study endpoint, then the sample size should be adjusted to provide desired statistical power for this endpoint." FDA Multiple Endpoints Guidance § III.B, at 8.

142. Two dose arms with the same number of patients cannot have the same power if one receives a fraction of the alpha and is designed to detect a smaller effect. A sponsor that knows its SAP assigns different alphas and target differences to the arms knows the two comparisons do not have equal chances of success and cannot truthfully describe them as equivalent opportunities to demonstrate efficacy.

143. The terms of Defendants' own version of the SAP establish that the two dose arms of Efzofitimod never had equal, or even comparable, chances of demonstrating statistical significance. Specifically, Section 3.1.6.1 of Defendants' version of the SAP states that initially 90% of the available alpha will be assigned to the 5 mg/kg arm and the remaining 10% to the 3 mg/kg arm. Section 3.1.6.3 of the SAP states that 4.5% of the global alpha will be used for the 5 mg/kg arm and the remaining 0.5% will be used for the 3 mg/kg arm. In practical terms, Defendants' version of the SAP set a much more difficult test for the 3 mg/kg arm. To be declared statistically significant, the 5 mg/kg result needed a p-value below 0.045 (95% confidence level) while the 3 mg/kg result needed a p-value below 0.005 (99.5% confidence level), a threshold almost ten times harder. In other words, Defendants

needed to be 99.5% confident that Efzofitimod's 3 mg/kg arm was the real cause of improvement, leaving only a 0.5% chance that the positive results were a mere fluke. Defendants' version of the SAP also expected the 3 mg/kg dose to produce a smaller benefit. The SAP's assumed changes from baseline ("CFB") in daily OCS dose yield the following drug versus placebo differences that each comparison was designed to detect: [25]

| **Baseline OCS < 10 mg/day** | **Drug Assumed CFB** | **Placebo Minus Drug** | **Absolute Difference to detect** |
|---|---|---|---|
| Placebo | −3.0 | — | — |
| 3 mg/kg | −5.0 | 5.0 − 3.0 | 2.0 mg/day |
| 5 mg/kg | −6.0 | 6.0 − 3.0 | 3.0 mg/day |
| **Baseline OCS ≥ 10 mg/day** | | | |
| Placebo | −4.5 | — | — |
| 3 mg/kg | −7.0 | 7.0 − 4.5 | 2.5 mg/day |
| 5 mg/kg | −8.0 | 8.0 − 4.5 | 3.5 mg/day |

144. Applying Defendants' version of the SAP's own inputs, including a common standard deviation of 6 and 88 patients per arm, Dr. Abrouk calculated the power of each comparison at its allocated level of significance: [26]

| **Comparison** | **Alpha allocated** | **Difference** | **Power** |
|---|---|---|---|
| 5 mg/kg, baseline < 10 | 0.045 | 3.0 mg/day | 89.5% |

[25] The absolute difference between placebo and drug was calculated by subtracting the observed placebo reduction in OCS (Baseline through study end) from the drug reduction in OCS (Baseline through study end). The inputs for the above calculated differences were obtained directly from aTyr's Phase 3 SAP provided by the Defendants. The software R was used to independently verify and validate the calculations (Core Team, R: A Language and Environment for Statistical Computing (R Found. for Stat. Computing 2025), https://www.R-project.org.

[26] These calculations were performed by adopting an average standard deviation from the Baseline estimates above via a standard approximation formula (SD% change ≅ SDchange x Baseline average (SD=Standard Deviation)), which then allows estimation of a reasonable approximation of the 95% confidence interval for the reported average reduction in daily steroid dose through the end of the study. This approximation formula is known as "The Delta Method."

| Comparison | Alpha allocated | Difference | Power |
|---|---|---|---|
| 3 mg/kg, baseline < 10 | 0.005 | 2.0 mg/day | 25.9% |
| 5 mg/kg, baseline ≥ 10 | 0.045 | 3.5 mg/day | 96.4% |
| 3 mg/kg, baseline ≥ 10 | 0.005 | 2.5 mg/day | 45.8% |

145. These tables carry a simple meaning. Even if Efzofitimod performed exactly as Defendants' version of the SAP assumed, the 3 mg/kg arm's power ranged between 25.9% and 45.8%, both of which are dramatically lower than the 90% figure Defendants repeatedly and misleadingly claimed both before and during the Class Period.

146. Defendants' version of the SAP assigns the 3 mg/kg comparison an assumed difference of 2.0 mg/day for patients with baseline OCS below 10 mg/day and 2.5 mg/day for patients at or above that threshold. Neither figure is 3 mg/day. And at those differences and its allocated alpha, the 3 mg/kg arm was nowhere close to 90% power.

### 8. Opinion 8: Defendants Reshuffled Phase 3's Secondary Endpoints in an Attempt to Obfuscate the Trial's Failure.

147. It is Dr. Abrouk's expert opinion that the late-stage changes to aTyr's secondary endpoints were not routine administrative adjustments but were instead indicative of reactive maneuvers during the conduct of a double-blind randomized controlled pivotal Phase 3 study. Based on his experience as a past member of multiple DSMBs for other clinical trials, Dr. Abrouk concludes that Defendants likely received negative efficacy signals and subsequently "reshuffled the deck" to hide the trial's impending failure.

148. ***The reshuffling of secondary endpoints suggests a "failed" primary signal***. Months before results were announced, aTyr quietly altered the order and definition of its secondary endpoints. For example, the Company swapped "Percent change in daily [OCS] dose" for "Steroid withdrawal rate" and relegated objective measures (like lung function/FVC) to the bottom of the list in favor of subjective

patient-reported outcomes. Defendants never discussed these changes or explained to investors why they were made so late in the game. In a double-blind randomized pivotal Phase 3 trial, changing secondary endpoints mid-stream is a major departure from established practice and requires a serious rationale with scientifically compelling justification under the condition that efficacy data was not analyzed prior to making the unusual change. According to Dr. Abrouk, this so-called "changing of horses in mid-race" is indicative of a "rescue mission." By moving more favorable-looking data to the top of the list, aTyr was likely attempting to position itself for an FDA Accelerated Approval based on secondary endpoints once it became clear the primary endpoint would fail.[27]

149. The specific pattern of endpoint changes is consistent with a sponsor positioning for FDA approval based on secondary endpoints. The specific nature of the Version 14 changes reveals a deliberate regulatory positioning strategy. By removing the "percent change from baseline in mean daily [OCS] dose post-taper" — the endpoint most likely to expose that all three arms were achieving similar large percentage reductions — and replacing it with a binary "steroid withdrawal rate" endpoint, Defendants replaced a continuous measure (which requires demonstrating a statistically significant mean difference) with a categorical measure (which requires showing only a difference in proportions of patients who achieved complete steroid elimination). Binary endpoints are more likely to yield nominally favorable results even when a continuous primary endpoint fails, because they convert a narrow numerical advantage into an apparently more impressive percentage-point difference. Similarly, the promotion of KSQ-Lung — a subjective, patient-reported outcome —

[27] Under the FDA Accelerated Approval Program, the FDA may grant marketing approval based on a "surrogate endpoint" or a secondary endpoint that is reasonably likely to predict clinical benefit, even if the primary endpoint is not met. Food & Drug Admin., Accelerated Approval Program, FDA.gov (last updated Feb. 27, 2026), https://www.fda.gov/drugs/nda-and-bla-approvals/accelerated-approval-program; *see also* https://www.fda.gov/drugs/development-resources/table-surrogate-endpoints-were-basis-drug-approval-or-licensure.

above the objective FVC endpoint was consistent with prioritizing the measures most likely to show a favorable trend for purposes of regulatory discussions with the FDA.

150. Based on Dr. Abrouk's experience with NDA and BLA submissions, this pattern of changes is consistent with a sponsor that anticipates the primary endpoint will not achieve statistical significance and is attempting to curate a secondary endpoint hierarchy that could form the basis of an alternative regulatory strategy. The FDA has on occasion accepted secondary or surrogate endpoints as a basis for marketing approval when the primary endpoint was not met but the totality of evidence supported a finding of clinical benefit. For example, Merck's Keytruda (pembrolizumab) received accelerated approval for certain oncology indications based on tumor response rate — a secondary endpoint — rather than overall survival. Biogen's Aduhelm (aducanumab) received approval for Alzheimer's disease based on the surrogate endpoint of amyloid plaque reduction, notwithstanding that the primary clinical endpoint (cognitive decline) showed inconsistent results across the two pivotal trials. These precedents are well known to experienced drug developers and, in Dr. Abrouk's opinion, provide the most plausible explanation for why aTyr would have added and reordered its secondary endpoints in the manner that it did: to position the Company for an FDA submission based on secondary-endpoint data in the event the primary endpoint did not achieve statistical significance.

151. ***Visual and Numerical Evidence of Futility.*** Based on the chronological maturity of the Phase 3 trial, it was not possible for aTyr to discern any clusters or separation in the patient data as its CEO publicly claimed in the spring and summer of 2025. As shown in aTyr's ERS Congress 2025 presentation on Slide 7, the mean change from baseline to Week 48 in steroid dependency was statistically (and visually) indistinguishable from placebo. While patients completed the trial on varying schedules, a review of the study's operational timeline shows that the patient outcome data was effectively static during the entire period in which Shukla claimed to see clustering and separation.

152. The Phase 3 trial utilized a 52-week observation period, but the primary efficacy endpoint was defined as the change in steroid dose at Week 48. The trial commenced on September 15, 2022, and reached formal completion on August 31, 2025, with aTyr announcing the final patient's Week 52 visit on July 22, 2025. Because the primary endpoint occurred four weeks prior to trial completion, the data for the vast majority of the 268 randomized patients were finalized prior to May 21, 2025, the date analysts first reported that the Company claimed to see separation in the data. With only 62 days remaining in a multi-year study, the dataset had reached a level of saturation where the primary efficacy trends were locked.

153. Even assuming the data was blinded and Defendants did not know whether patients were in the treatment or placebo arm, as Shukla admitted, *infra* ¶248, Defendants had access to each patient's daily OCS dose diary that tracked how much OCS each patient was taking during any given day. It was this patient data that would have revealed whether there was any separation or clustering among the patient population, and Defendants' own subsequent admission proves that none existed when they claimed to see separation.

154. From a biostatistical perspective, the primary efficacy measure — an average change across the total population — is highly stable once a certain threshold of patient completion is reached. By May 2025, the percentage of patients who had yet to reach the Week 48 landmark was statistically insignificant. Thus, in Dr. Abrouk's expert opinion, there is a near-zero probability that the final data points from this remaining fraction of the population could have fundamentally altered the trial's results. If a distinct clustering or separation of efficacy had existed in May, June, or July, as represented by Shukla, it necessarily would have been noticeable in the chart published in the ERS Congress 2025 presentation on Slide 7.

Change from Baseline in OCS

ERS CONGRESS | 2025
27 September – 1 October | Amsterdam, Netherlands




OCS Dose at Week 48

| | Placebo N=90 | Efzofitimod 3 mg/kg N=86 | Efzofitimod 5 mg/kg N=88 |
|---|---|---|---|
| LS mean dose at week 48 (mg) | 3.5 | 3.5 | 2.8 |
| LS mean change from baseline (mg) | -7.1 | -7.1 | -7.9 |
| Difference in LS mean (95% CI) | - | 0.0 (-1.5, 1.5) | -0.7 (-2.2, 0.8) |
| *p-value* | - | *0.9804* | *0.3313* |

*Figure 1: Slide 7 of Presentation by Dr. Daniel Culver of Cleveland Clinic for ERS Congress, September 27, 2025 to October 1, 2025, Amsterdam, Netherlands.*

155. On Slide 7 of the ERS 2025 presentation, all three curves representing the primary efficacy endpoint for Efzofitimod 3 mg/kg, Efzofitimod 5 mg/kg, and placebo sit on top of each other through the entire time from baseline to Week 52. It is because of this complete lack of efficacy at any time point of the study that any blinded examination of the primary efficacy data in the months prior to the September 15 announcement would have simply revealed a single cluster of efficacy results – and should have alerted aTyr to the futility of the study. And critically, Shukla told investors that he knew the average change in OCS dose during the Class Period, *see infra* at ¶¶246-252, but the actual data from Slide 7 contradicts his representations about separation regardless of whether he had access to blinded or unblinded data.

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS & OMISSIONS[28]

156. The Class Period begins on June 5, 2024, when Defendants participated in the Piper Sandler Virtual Lung Investor Day Conference. During that event, Shukla

[28] Unless otherwise noted, all emphasis in this section is added. Where larger quotations were necessary to provide context and meaning to the alleged

emphasized multiple times that the Company's Phase 1b/2a clinical trial for Efzofitimod established the Proof of Concept required to advance to the pivotal Phase 3 trial and falsely claimed that the Proof of Concept was "validated" by peer-reviewed journals:

> Potential new class of medicines here, a brand new modality that we are finding some exciting, both clinical and preclinical insights around. These proteins seem to have a distinct focus around inflammation in fibrosis. I think it's highly differentiated. And right now we view this as an opportunity that could produce multiple opportunities in areas where there's unmet need. The first fragment we looked at and harnessed some of the power behind its immunomodulatory properties was a fragment of histidyl-tRNA synthetase that's there in the helix-turn helix yellow motif that you see there. And we engineered then a protein fragment, a biologic that is a first in class immunomodulator that we're targeting interstitial lung disease. And I'd say we're the leading interstitial lung disease company right now in the world. ***We established a clinical proof of concept with a phase two trial in pulmonary sarcoidosis that read out a few years ago with perhaps the best data set seen in the last 50 or 60 years***.
>
> ***
>
> ***So a lot of validation in peer reviewed journals. We think that's important when you talk about new areas of biology***. Scientists, clinicians, they want to learn more about the MOA, and I would expect even further literature to come out of our state. ***The CHEST Journal was really the landmark publication that I encourage everyone to look at. That was our proof of concept that validated our science.*** So a growing pipeline of tRNA synthetase derived biologics, focusing first on interstitial lung disease. We follow the data. Efzofitimod is a fragment of histidyl-tRNA synthetase and modulates neuropilin-2. Neuropilin-2 is a cell surface receptor highly expressed on myeloid cells. So by turning down these myeloid cells, we think it could be useful in sarcoidosis, SSc-ILD and potentially other ILDs.
>
> ***

---

misstatements, Plaintiffs have bolded and italicized the materially false and misleading parts of the statements identified.

> This actually led to a partnership with Kyorin in Japan where we've been able to license the therapy at preclinical stage for interstitial lung disease. As I mentioned, dosed once monthly through one hour IV infusion ***and clinical proof of concept was demonstrated in pulmonary sarcoidosis.*** Here's our hypothesis. In the number of interstitial lung diseases, the hallmark is immune pathology and unremitting immune pathology can come from different origins. It can be related to an autoimmune disease like scleroderma, now it attacks your lungs. It can be related to antigens such as pigeon dander or even particulate matter that causes things like hypersensitivity pneumonitis.

157. The statements identified in Paragraph 156 were materially false and/or misleading when made because: (a) the Phase 1b/2a trial never demonstrated any efficacy but only directionality – a distinction that, while critical to evaluating the drug's prospects, requires specialized biostatistical expertise to understand; (b) none of the endpoints to test for efficacy in the Phase 1b/2a trial achieved statistically significant results or results close to being statistically significant; and (c) the CHEST study did not "validate [defendants'] science," make or support Proof of Concept claims, but instead found that the results were "statistically nonsignificant," and directionality merely supported further study in additional clinical trials. Detecting the falsity of Defendants' "Proof of Concept" claims required the ability to interpret confidence intervals, p-values, and effect sizes in the context of a small, underpowered clinical trial — analytical skills that even sophisticated investors do not possess. A reasonable investor hearing that a peer-reviewed journal had "validated" the Company's science would have no basis to question that characterization without expert biostatistical training.

158. Analysts credited Defendants' Proof of Concept claims. On October 4, 2024, Wells Fargo initiated coverage at "Overweight" with a $17 price target, describing the Phase 1b/2a results as "showing a dose dependent efficacy improvement."[29] On September 5, 2024, Jefferies initiated at "Buy" with a $9.00

[29] *See* Derek Archila, Eva Fortea Verdejo, and Adam Vogel, *aTyr Pharma, Inc. (ATYR) Investors Underappreciating Efzofitimod Which Offers Excellent Entry*

price target, premised on Efzofitimod's "adjusted peak sale in pulmonary sarcoidosis" of approximately $400 million at a 35% probability of success — assumptions derived directly from Defendants' Proof of Concept representations.[30]

159. On August 13, 2024, the Company filed its financial results for the second quarter of 2024 on SEC Form 10-Q. The August 2024 10-Q was signed by both Shukla and Broadfoot. In the August 13, 2024 10-Q, the Company misrepresented several risks as merely hypothetical when they had already materialized:

> ***We may encounter substantial delays and other challenges in our ongoing or planned clinical trials or we may fail to demonstrate safety and efficacy to the satisfaction of applicable regulatory authorities.***
>
> ***
>
> ***If the results of our clinical trials are perceived to be negative or inconclusive***, or if there are safety concerns or adverse events associated with our product candidates, we may be required to perform additional clinical trials to support approval or be subject to additional post-marketing testing requirements; ***be delayed in obtaining marketing approval for our product candidates, if at all***; obtain approval for indications or patient populations that are not as broad as intended or desired; obtain approval with labeling that includes significant use or distribution restrictions or safety warnings; be subject to changes in the way the product is manufactured or administered; have regulatory authorities withdraw their approval of the product or impose restrictions on its distribution in the form of a modified risk evaluation and mitigation strategy; be subject to litigation; ***or experience damage to our reputation***.
>
> ***
>
> ***If we are unable to successfully complete or otherwise advance clinical development, obtain regulatory or marketing approval for, or successfully commercialize our therapeutic product candidates, including efzofitimod, or***

*Point-Initiating Overweight with a $17 PT*, WELLS FARGO SECURITIES, October 4, 2024.

[30] *See* Roger Song, *aTyr Pharma (ATYR): An Interesting tRNA Platform with Lead in Pulmonary Sarcoidosis-Initiate at Buy*, JEFFERIES, September 5, 2024.

> ***experience significant delays in doing so, our business will be materially harmed.***
>
> ***
>
> ***Although we were able to establish clinical proof-of-concept for efzofitimod in our Phase 1b/2a clinical trial in patients with pulmonary sarcoidosis, this may not be validated in other clinical trials**. **Any failure to demonstrate in controlled clinical trials the requisite safety and efficacy of our product candidates will adversely affect our business, prospects, financial condition and results of operations***.
>
> ***
>
> ***Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of a particular product candidate or product and our company in general**. **In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine is material or otherwise appropriate information to include in our disclosure, and any information we determine not to disclose may ultimately be deemed significant with respect to future decisions, conclusions, views, activities or otherwise regarding a particular product, product candidate or our business. If the top-line data that we report differ from actual results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for, and commercialize, our product candidates may be harmed, which could harm our business, operating results, prospects or financial condition***.

160. The statements identified in Paragraph 159 were materially false and/or misleading when made because: (a) the Phase 1b/2a trial did not establish Proof of Concept, dose response or efficacy; (b) the actual conclusions of the CHEST study, industry participants and experts were already at odds with Defendants' assumptions and conclusions; (c) Defendants had access to Phase 3 efficacy data that already diminished the chances of Phase 3's success; and (d) Defendants omitted that (a)-(c) materially increased the risk of failure of the Phase 3 trial.

161. On September 5, 2024, Defendants participated in the H.C. Wainwright 26th Annual Global Investment Conference, where Broadfoot misleadingly claimed that the dose response observed in the Phase 1b/2a trial established Proof of Concept:

> We believe the mechanism of action down regulates myeloid cells via that NRP2 receptor. So we bind selectively to NRP2, and that allows us to actually change those myeloid cells and stop the inflammation that's occurring in the lungs. And we saw this through over half a dozen different types of animal models that we did prior to going into pulmonary sarcoidosis patients. We saw both an anti-inflammatory effect and an antifibrotic effect. ***And then we believe our Phase 2 trial in pulmonary sarcoidosis actually has given us clinical proof of concept***.
>
> ***
>
> We did see that some patients on placebo were able to taper down, but their symptoms worsened. So they were able to get maybe not all the way down to where we wanted them to be on placebo, but they couldn't stand it, which is one of the reasons why we designed our Phase 3 trial to be 12 months. This was a six-month study where we took the patients down to five milligrams. And about halfway through the study, the PIs came to us and said, "Hey, I've got some patients. They're feeling really good. Can I take them down to zero?" So we modified the protocol and allowed the PIs to take their patients down to zero and take them completely off of steroids. And the three patients that were able to do that were in the 5 mg arm. ***So we saw dose response in all of these endpoints, as well as dose-dependent improvement in inflammatory biomarkers. So we're very happy with this data. We feel it's proof of concept. It was published in a peer-reviewed journal, in the CHEST Journal***.

162. The statements identified in Paragraph 161 were materially false and/or misleading when made because: (a) the Phase 1b/2a trial never demonstrated any efficacy but only directionality; (b) none of the endpoints to test for efficacy in the Phase 1b/2a trial achieved statistically significant results or results close to being statistically significant; (c) dose response was not established in Phase 1b/2a as none of the treatment arms (1 mg/kg, 3 mg/kg, 5 mg/kg) were statistically significant, and

none satisfied accepted scientific standards for establishing a dose-response relationship; and (d) the CHEST study did not make or support Proof of Concept claims or find a dose response, but instead found that the results were "statistically nonsignificant," and directionality merely supported further study in a larger Phase 2b clinical trial. That even professional analysts with expertise in pharmaceutical development credited these representations underscores that no reasonable investor, lacking such specialized training, could have been expected to see through them.

163. Analysts at Wells Fargo repeated Broadfoot's characterization, describing the Phase 1b/2a data as establishing "encouraging" dose-dependent efficacy improvement and stating: "We believe overall these results are encouraging, showing a dose-dependent efficacy improvement."[31] Cantor Fitzgerald, which initiated coverage on January 6, 2025 at "Overweight," stated that "KOL comments" reflected that in the Phase 1 trial, "they hit on all symptom scales, which does not happen usually. The improvements were not trivial. It's hard to ignore," and noted that dose response "implies a high probability that improvement on these scales is due to the drug."[32]

164. On September 18, 2024, Defendants participated at the Cantor Fitzgerald 26th Annual Global Healthcare Conference. At this event, Shukla was asked pointed questions regarding whether the Phase 1b/2a trial had established efficacy, and Shukla provided the following false and misleading response:

---

[31] *See* Derek Archila, Eva Fortea Verdejo, and Adam Vogel, *aTyr Pharma, Inc. (ATYR) Investors Underappreciating Efzofitimod Which Offers Excellent Entry Point-Initiating Overweight with a $17 PT*, WELLS FARGO SECURITIES, October 4, 2024.

[32] *See* Cantor Fitzgerald & Co., *aTyr Pharma, Inc. (ATYR): Initiating at Overweight—Compelling Opportunity for Efzo in Pulmonary Sarcoidosis, CANTOR FITZGERALD*, January 6, 2025.

> **Question - Prakhar Agrawal (Analyst):**
>
> Okay. And you're in phase three trial right now, but you had phase one two readout a few years back. So maybe just walk us through the results that you saw in pulmonary sarcoidosis back then. ***What was the patient population, the dose that you tested, and the results on the efficacy***?
>
> **Answer - Shukla:**
>
> So in that trial is a small trial, 37 patient trial. We tested three doses of efzofitimod in a six month trial. One, three, and five milligrams per kilogram were tested against placebo. What we are hoping to see is some trends, maybe some trends of improvement with steroid reduction, maybe some forced vital capacity improvement, maybe PROs improved. As it turns out, it was better than probably any of us expected. ***We saw improvements in steroid reduction, FVC improvements that were clinically meaningful***. And in all of the PROs we tested, the King Sarcoidosis Questionnaire is cough and shortness of breath. We looked at transitional dyspnea index, fatigue assessment scale. ***All of them improved and they improved in a dose dependent manner. I think it's very important for all the investors to pay attention to. Anybody shows you phase two data, make sure you see that dose response. And let's also see the dose response in subjective and objective endpoints. And that's what we saw***.
>
> So even though it was a small trial, I think the ***signals were highly, highly positive***. We even went further and did a PKPD exposure response, looking at each individual patient, and that showed that as you administer more drug, you get better pharmacodynamic effects. And I think this sort of created a lot of excitement in the field and got us into phase three. ***That was published in CHEST a few years ago as well***.

165. The statements identified in Paragraph 164 were materially false and/or misleading when made because: (a) the Phase 1b/2a trial results did not demonstrate efficacy, Proof of Concept or dose response, but mere directionality that did not support Shukla's positive representations; (b) the differences from placebo observed in the Phase 1b/2a trial were not meaningful; (c) the Phase 1b/2a trial was a small, underpowered study with a disproportionate number of dropouts and thus dose response could arise from random variation alone; and (d) the CHEST study did not support Shukla's false representations.

166. From the moment the trial's design was announced, and even for years before the August 18, 2025 SAP was apparently memorialized, Shukla described both arms as equally and highly powered. Despite knowing that the 3 mg/kg arm was nowhere close to being 90% powered, as early as September 14, 2022, Shukla told investors that Defendants had "two shots on goal here, three or five" and that "[b]oth of these arms are powered over 80% statistical power." Similarly, two months later on November 15, 2022, he again misrepresented that the 3 mg/kg and 5 mg/kg arms "create[d] two shots on goal" and that "[e]ither dose is powered at 92% power." Shukla further explained that he wanted "over 90% for either of these doses to win. So there's two shots on goal here." Then on June 8, 2023, Shukla continued the charade and confirmed to investors that "[t]his trial is powered at 92% to show either 3 or 5 milligrams will show efficacy." Similarly, on May 16, 2024, Shukla once again claimed that the trial was "92% power[ed] that either 3 [mg] or 5 [mg] will show effectiveness over placebo." As set out, *infra* ¶¶206-207, Defendants made similar misrepresentations during the Class Period while hiding all versions of the SAP from investors, the very document that contradicted their false and misleading representations of "having two shots on goal" towards efficacy.

167. On September 18, 2024, at the Cantor Fitzgerald 26th Annual Global Healthcare Conference, Shukla also represented that the Phase 3 trial was "overpowered" to show statistical significance for both arms:

> This is a one year trial compared to a six month trial. It's a trial that tapers everyone down to zero versus five in the last trial. So we're getting a little more aggressive. Our view is with a more aggressive taper protocol and a longer trial, we'll see a greater rise in those placebo failures. We'll see the steroids tick up, and then our drug we think can maintain a low or potentially no dose steroid. There's your stat sig. ***Our trial is now powered 92%, overpowered, 88 per arm.*** Last trial was 37 patients. So we were aiming for 264 patients. We over enrolled. We just finished enrollment, 268 patients were enrolled. ***So we've got a highly powered trial to show that either three or five, our top two doses from the last trial will show stat sig in steroid reduction.***

168. The statements identified in Paragraph 167 above were materially false and/or misleading when made because: (a) the Phase 3 trial was not "overpowered" and was not "powered 92%" to show that "either three or five" would achieve statistical significance; (b) the SAP allocated 90% of the available alpha to the 5 mg/kg comparison and only 10% to the 3 mg/kg comparison, requiring the 3 mg/kg arm to clear a significance threshold almost ten times more demanding than the threshold for the 5 mg/kg arm; (c) applying the SAP's own assumptions, the 3 mg/kg arm was powered only within a range of 25.9% and 45.8%; and (d) Defendants omitted to disclose that the alpha allocation and the resulting disparity in power meant that both doses would not show "stat sig in steroid reduction."

169. On November 7, 2024, the Company filed its financial results for the third quarter of 2024 on SEC Form 10-Q. The November 2024 10-Q was signed by both Shukla and Broadfoot. That filing contained the same false and misleading statements as those set forth in Paragraph 159. These statements were materially false and/or misleading for the same reasons set out in Paragraph 160.

170. On November 18, 2024, Defendants attended the Stifel Healthcare Conference. At this event, Shukla repeatedly claimed that aTyr had established both dose response and Proof of Concept, represented that all efficacy endpoints in Phase 1b/2a demonstrated positive trends, and misleadingly referred to the CHEST study as supportive of his misleading statements:

> ***Our proof of concept really was extremely promising, just highlighted again at the CHEST conference in Boston as Best of CHEST. We saw, frankly, data that was much better than any of us or the experts expected.*** We wanted to see potentially the ability to reduce steroids, maybe improve lung function, maybe even improve some symptoms. ***As it turns out, we saw in that Phase 2 data, which was published in the journal CHEST, all three, steroid reduction, improved lung function and improvement of symptoms, quite remarkable in a small trial***. And thus far, no significant safety issues have emerged. And that's really important because we are trying to replace rather toxic steroid therapy, or at least work our way on the journey to replace steroids in ILDs.

***

***Here's a snapshot of our proof of concept data. So remember I told you we were looking to see if we saw any trends in steroid reduction, or lung function, or even symptom improvement. And as it turned out in this small trial, in all of these measures, subjective and objective endpoints, we saw dose response. I want to keep that in mind. Dose response is really important here for any biotech company when you're moving from Phase 2 to Phase 3. You better see dose response, at least the way I was trained at Roche Nutley a couple decades ago, we only moved programs forward into Phase 3 if you see dose response, and you better see dose response with multiple endpoints. And we did that.***

***

***For those of you that like inflammatory biomarkers, investors earlier today quizzed me on those, we also see dose dependent improvement there too. So whatever endpoint you like, we're seeing dose response. That's really important. And I would actually say it's harder to demonstrate that in a small trial than a bigger trial. Makes sense, right? If you have 370 patients, I can get trends, I can figure out trends in all kinds of things. 37 patients, much harder to show trends. We saw positive trends here in every single endpoint. This allowed us to move into Phase 3***.

171. The statements identified in Paragraph 170 above were materially false and/or misleading when made because: (a) the Phase 1b/2a trial did not establish efficacy, Proof of Concept, or dose response; (b) the Phase 1b/2a trial was a small, underpowered study with only "37 patients" and a high number of dropouts and thus dose-response trends could arise from random variation alone; (c) using an unduly small number of patients in a clinical trial does not make it "harder to show trends," because small trials are prone to false positives (as well as false negatives); and (d) the CHEST study did not find that the "steroid reduction, improved lung function and improvement of symptoms" endpoints were "remarkable" but found that each of these was "statistically nonsignificant."

172. On November 18, 2024, the same day as Shukla's presentation, Wells Fargo reiterated its $17 price target and "Overweight" rating.[33] RBC Capital Markets similarly maintained its $16 price target and "Outperform" rating, reflecting a 40% probability of success in pulmonary sarcoidosis — a probability derived from Defendants' claims of dose response and Proof of Concept.[34]

173. Two days later, on November 20, 2024, Defendants participated in the Jefferies London Healthcare Conference. Here, Shukla falsely claimed that (a) most experts thought Efzofitimod had "steroid-like efficacy," (b) the CHEST study had established Proof of Concept <u>when it did not</u>, and (c) the Phase 1b/2a trial demonstrated efficacy in all endpoints, when it did not:

> By restoring that immune balance without evidence of suppression, this is what we need in this class of diseases. ***And frankly, most of the experts view Efzofitimod as having steroid-like efficacy without steroid-like toxicity. We had some very promising clinical proof of concept data a few years ago we published in CHEST***. I'll talk to you a little bit about that. ***But what I was looking for was, could we reduce steroids or maybe would we see signals in lung function? Could we also improve symptoms? As it turned out in that study, all three of those endpoints, subjective objective endpoints, all moved in a very positive manner.*** This is what got the pulmonary community really excited about our therapy. ***Going three for three with these endpoints was really unexpected.*** And I think this is even why even recently at the CHEST conference in Boston, Efzofitimod was highlighted as best of CHEST. And so the general pulmonary community is now getting quite excited about our therapy.
>
> ***
>
> The data. The data was published, as I said, in CHEST. Dan Culver is our lead PI. He's the chair of Critical Care and Pulmonary Medicine at Cleveland Clinic. ***Again, we were***

[33] *See* Derek Archila, Eva Fortea Verdejo, and Adam Vogel, *aTyr Pharma, Inc. (ATYR) 3Q24 Recap—Attractive Risk-Reward Ahead of Efzofitimod's Ph3 Pulmonary Sarcoidosis Data in 3Q25; Reit. Overweight*, WELLS FARGO SECURITIES, November 7, 2024.

[34] *See* Gregory Renza, Luca Issi, and George Farmer, *aTyr Pharma (ATYR): 3Q24 Value to Unlock in 2025 with SSc-ILD & Pivotal Pulmonary Sarcoidosis Data*, RBC CAPITAL MARKETS, November 8, 2024.

> ***looking and hoping to see trends in one of these endpoints. In all of these endpoints, we showed efficacy.*** And I think the one thing to pay attention here is the dose response. Over and over again, as you administer more of our therapy, better steroid reduction. Our top do two doses. Higher up the dose, the better the lung function and FVC improvement. Same thing here. As you actually administer more of the drug, you get here less fatigue is good, but you also get better shortness of breath scores and KSQ lung is right here. King's College has a sarcoidosis quality of life instrument. Dr. Behring across the river said this is the best data he's ever seen with the index that he created about 20 years ago.

174. The statements identified in Paragraph 172 were materially false and/or misleading when made because: (a) the Phase 1b/2a trial did not establish efficacy, Proof of Concept, or dose response; (b) none of the endpoints to test for efficacy in the Phase 1b/2a trial achieved statistically significant results or results close to being statistically significant; (c) dose response was not established in Phase 1b/2a as none of the treatment arms (1 mg/kg, 3 mg/kg, 5 mg/kg) were statistically significant and none satisfied accepted scientific standards for establishing a dose-response relationship; and (d) the CHEST study did not make or support Proof of Concept claims, but instead found that the results were "statistically nonsignificant," directionality merely supported further study in additional clinical trials, and did not find there was a dose response in any treatment arm.

175. At the same event, Shukla conflated dose response with efficacy, falsely stating that Efzofitimod was "producing outstanding benefit" for patients:

> ***Dose response is really important here. I've asked you all to look at biotechs here in phase two and say, "You better have dose response and you better show it in multiple endpoints before you move into phase three." This is why I think we were highlighted in Best of Chest even just recently in Boston. Some recent data that we published in ERJ about a month or two ago. Post-hoc analysis, that was an underpowered trial, 37 patients. I would say it's actually harder to show trends when you have less M than more M.*** But in this trial, we pooled the therapeutic doses and compared it to sub-therapeutic. There you see the Kaplan-Meier highly significant in time to first relapse. And we also look at those ultra responders where they have a KSQ of

> three times the MCID. ***Again, we see a really, really nice stat sig signal. This was published in ERJ just recently. Further evidence that the drug here is really producing outstanding benefit in these patients***.

176. The statements identified in Paragraph 175 were materially false and/or misleading when made because: (a) the Phase 1b/2a trial did not establish efficacy, Proof of Concept or dose response; (b) the CHEST study did not find that the data established "dose response" in any of the secondary efficacy endpoints; (c) the "stat[istical] sig[nal] signal" was compromised because pooling dose groups after unblinding violates the foundational biostatistical principle of "analyze as you randomized" or the "intention-to-treat analysis"; and, as a result, (d) there was no basis for Shukla to claim that the "drug was really producing outstanding benefit in these patients."

177. At the same Jefferies London Healthcare Conference, Shukla again represented that the Phase 3 trial was "overpowered" to show statistical significance for both arms:

> Here's a little bit about how we set that up. We enrolled patients anywhere between 7 to 25 milligrams stably treated steroid-dependent patients. I was looking for folks who at least had a diagnosis for six months, biopsy proven, and we're following patients for a year. We enrolled them in three arms, 88 per arm. Took our top two doses where we saw efficacy in the last trial, compared it to placebo. ***So now this is a well powered trial. In fact, it's overpowered. 92% power that either five or three still stat sig compared to placebo.*** I'm looking for steroid reduction. I'm following these patients.

178. The statements identified in Paragraph 177 above were materially false and/or misleading when made because: (a) the SAP allocated 90% of the available alpha to the 5 mg/kg comparison and only 10% to the 3 mg/kg comparison, requiring the 3 mg/kg arm to clear a significance threshold almost ten times more demanding than the threshold for the 5 mg/kg arm; (b) applying the SAP's own assumptions, the 3 mg/kg arm was powered only within a range of 25.9% to 45.8%; and, as a result,

(c) the trial was not powered to show "stat sig compared to placebo" for the 3 mg/kg arm.

179. On December 3, 2024, Defendants attended the 7th Annual Evercore ISI HealthCONx Conference. At this event, Shukla falsely stated that the results of the Phase 1b/2a trial showed "trends of efficacy in all of the endpoints":

> **Question - Gavin Clark-Gartner (Analyst):**
>
> All right. Let's move beyond some of the deep biology and go over to the Phase 3 design, since that data's coming out very soon, actually. Maybe a good place to start, just remind us why you're using steroid taper or steroid reduction as the primary endpoint and how those conversations with the FDA went.
>
> **Answer - Shukla:**
>
> Sure. So steroid, as I mentioned, are... Steroids are the mainstay treatment for pulmonary sarcoidosis and many interstitial lung diseases. ***When we looked at our Phase 2 results, which showed really nice trends of efficacy in all of the endpoints we looked at, steroid reduction, lung function improvement measured by forced vital capacity, and also the quality of life instruments, cough, fatigue, shortness of breath, all trended in a very positive direction***. We sat down with the agency to think about what should we prioritize as the primary endpoint, and steroid reduction was viewed as potentially the most clinically relevant of all of those families of endpoints we looked at. So based on some of that feedback, we also know that sarcoidosis patients can present not just with restrictive disease, but sometimes obstructive disease. So forced vital capacity is an important endpoint, but probably better slotted as a secondary endpoint.

180. The statements identified in Paragraph 179 above were materially false and/or misleading when made because the Phase 1b/2a trial did not demonstrate efficacy for the following reasons: (a) it was an underpowered study with only 37 patients that did not have the statistical potential to show separation between the placebo and treatment arms; (b) the 24.3% dropout rate further reduced the sample size and increased variability in the efficacy data such that none of the treatment arms achieved numerical superiority or a statistically significant difference from the

placebo arm; (c) it only demonstrated minor "numerical trends" and directionality, not statistical significance or close to it; (d) the steroid reduction was below the 50% threshold considered clinically meaningful; and (e) dose response was not established in any treatment arm. While the Phase 1b/2a trial results were publicly available in the CHEST study, understanding that these results fell short of establishing efficacy, Proof of Concept, or dose response required the specialized expertise of a trained biostatistician — the precise expertise that Shukla possessed but that ordinary and even sophisticated investors did not.

181. On January 16, 2025, Defendants attended the 43rd Annual J.P. Morgan Healthcare Conference. At this event, Shukla again falsely claimed that there was both Proof of Concept and a dose response, misrepresented that the CHEST study found that Proof of Concept was established when it did not, and bragged that Efzofitimod performed "brilliantly" during the Phase 1b/2a trial:

> We have what I would describe as a rather elegant immunomodulator, something that is doing things subtly, safely. And in a disease where there's complex immune pathology, we need to think about a different kind of modality, and that is Efzofitimod. Restoration of that immune balance without evidence of suppression. This is something that you're going to hear me say several times in this presentation. This is what's essential and why I think this is a therapy that as Dan Culver, our lead PI's chair of pulmonary and critical care medicine at Cleveland Clinic.
>
> He said, this is paradigm shifting. If we can get this across the finish line. ***There's promising clinical proof of concept that we have published, and I'll go through some of that data. It was quite striking to all of us that we were exploring a number of endpoints here, steroid reduction, quality of life. We're looking at lung function. In all of those subjective and objective measures, the drug performed brilliantly. And why do I say that? We had a dose response***.
>
> ***And I'm sure you've heard a lot of companies over the last several days talk about dose response. We not only saw dose response, but we saw it in all of those endpoints we measured.*** So it gives us a lot of confidence moving here into phase three. Last thing, no known safety issues. We are replacing toxic therapy, so patients deserve something that

> is not going to create a new burden of toxicity. This modality offers that opportunity, and it's why patients who are currently finishing our trial are demanding to remain in our trial right now.
>
> ***
>
> Because that's going to be a key component to the value proposition if and when we get approved here. ***Clinical proof of concept, that's been demonstrated, and I'll show you some of that data.***
>
> ***
>
> Again, I call it an elegant immunomodulator because it's not a real overt hammer, but it's working with our biology to retune the system here so that we actually have healthy lungs and not inflamed lungs. ***Our clinical proof of concept was presented years ago and written up in the journal CHEST, and we recently were awarded Best of CHEST***. They said this is one of the most viewed, if not, the most viewed article in the last four years.

182. The statements identified in Paragraph 181 were materially false and/or misleading when made because: (a) mere directionality is insufficient to show Proof of Concept; (b) Efzofitimod did not "perform brilliantly" since "dose response" was lacking in both "steroid reduction" and "lung function"; and (c) the CHEST study never mentioned the phrase "proof of concept" or concluded that Proof of Concept was established. The gap between what the CHEST study actually reported and Defendants' characterization of its findings could not have been detected by a reasonable investor without expert-level fluency in clinical trial biostatistics.

183. On January 16, 2025, at the 43rd Annual J.P. Morgan Healthcare Conference, Shukla represented that the fully enrolled Phase 3 trial was "highly powered" to test both arms:

> A good timing for all of you. We're finished with enrollment and now we're just waiting for data. This was now a well-powered and highly powered design trial, 88 patients per arm. We took the two efficacious doses in phase two forward. We finally enrolled 268 patients. Some key things here. In the last trial, we noticed we could knock down steroids pretty well down to five milligrams, but we're leaning into that signal a little bit more in this trial and we're attempting to taper people to zero.

184. The statements identified in Paragraph 183 above were materially false and/or misleading when made because: (a) the SAP allocated 90% of the available alpha to the 5 mg/kg comparison and only 10% to the 3 mg/kg comparison, requiring the 3 mg/kg arm to clear a significance threshold almost ten times more demanding than the threshold for the 5 mg/kg arm; (b) applying the SAP's own assumptions, the 3 mg/kg arm was powered only within a range of 25.9% to 45.8%; and as a result, (c) the trial was not well powered to "[take] the two efficacious doses in Phase 2 forward."

185. On February 18, 2025, Leerink Partners initiated coverage at "Outperform" with a $16 price target, crediting Defendants' representations. RBC Capital Markets similarly maintained its $16 price target, describing a 40% probability of success based on the Proof of Concept data.[35]

186. On March 10, 2025, at the Leerink Global Healthcare Conference 2025, Shukla was asked whether the results of the Phase 1b/2a trial were "all noise," and he responded that the results "hit on" all of the endpoints and again claimed dose response and efficacy were both established:

> **Question - Faisal Khurshid (Analyst):**
>
> Yeah. Cool. Cool. So in terms of where investors are on this, there's kind of three main pushbacks that I see investors have. So one is this drug isn't real, it's inert. ***Two is the Phase I/II data is all noise. And three, the Phase III study, debatable whether it tests a meaningful endpoint and whether that would engender use in this population***.
>
> So I'm going to play bad cop on this. I want to kind of drill into each of those in sequence. ***Maybe we start with that second one, kind of the Phase I/II study and just how to think about that. So can you walk us through kind of ... So in the Phase I/II, pulmonary sarcoidosis, steroid-controlled disease, you do steroid tapering in that Phase I/II, but your Phase I/II steroid tapering protocol***

[35] *See* Gregory Renza, Luca Issi, and George Farmer, *aTyr Pharma (ATYR): Takeaways from the Road—Efzo's 3Q Pivotal Data & Building Newsflow Over 2025 Offer A Path for Increasing Conviction*, RBC CAPITAL MARKETS, February 13, 2025.

> ***was a little bit different than what you're doing in Phase III. Can you explain that difference, and how that should color the investor interpretation of that data***?
>
> **Answer - Shukla:**
>
> Sure. So I'll take a step back around that trial, and maybe some of the skepticism, which is fair to first address. It was a small trial, it was a 37 patient trial. Short trial, six months, in a disease that we thought we might be able to see a signal. We were hoping to see beyond just demonstrating safety, a signal potentially in steroid reduction. We hoped maybe we might see something with regards to quality of life. Maybe some of the symptom scores improved. Maybe we would see some amount of lung function improvement, immune biomarkers. We were hoping to see some sort of trend there. ***As it turns out, we hit on all of those subjective and objective endpoints I just talked about. And what I mean by hit on those, we showed a dose response. And I would posit that it's extremely difficult in a small trial to see that consistent a signal emerge on whether you looked at a functional endpoint, a reduction of steroid endpoint, cough, fatigue, shortness of breath, immune biomarkers, a lot harder to do with an n of 37 versus an n of 3700***.
>
> So it's that remarkable consistency that we saw that really gave me a lot of confidence that, hey, there's a real signal here. And Dan Culver, our lead PI, who's the chair of pulmonary and critical care at Cleveland Clinic, said publicly, he said, "You guys either got incredibly lucky," which is what I'll default to. I'm a biostatistician. Oh, it's just chance. "Or you have a remarkable drug." ***So I think the setup was to show some trends of efficacy, and I believe most of the experts were really shocked to see that consistent dose response***.

187. The statements identified in Paragraph 186 were materially false and/or misleading when made because: the Phase 1b/2a trial (a) did not establish a "dose response," but only numerical trends, wholly insufficient to establish efficacy; and thus, (b) there was no "consistent signal" that emerged from a "functional endpoint" like "a reduction of steroid endpoint" in the absence of a dose response.

188. At the same Leerink Global Healthcare Conference 2025, Shukla was pointedly asked why investors were hesitant about the Company and the Efzofitimod clinical trials, and he responded that investors would see a "real confidence signal" based on the Company's "transparency" and the information it publicly disclosed:

> **Question - Faisal Khurshid (Analyst):**
>
> Got it. Okay. And then last question, what do you think investors misunderstand most about the company and the story?
>
> **Answer - Shukla:**
>
> The biggest thing we always get is, "There has to be something wrong here that I can't figure out." And I think to be honest-
>
> **Question - Faisal Khurshid (Analyst):**
>
> Because of valuation, or-
>
> **Answer - Shukla:**
>
> I think it's because of valuation. You put a one in front of our stock price, all of a sudden everyone starts to get a lot more comfortable. But ***if people really pay attention to the science, how we brought things forward, how much we publicly release, how transparent we are, and talk to some of the KOLs and some of the experts that we work with, I think they will actually see a real confidence signal there***. But again, when you work with a new modality, new target, new indication, I think that can be scary to investors, but we are confident that if we're successful here, we can really unlock things not only for efzo, not only for our pipeline, but really for aTyr itself to really get on the map in the way that I believe it should be afforded, based on the data that we produce.

189. The statements identified in Paragraph 188 above were materially false and/or misleading when made because Defendants repeatedly made false and misleading statements about Efzofitimod's clinical trials throughout the Class Period and omitted material information from investors as alleged elsewhere herein, rendering Shukla's claims of transparent disclosure materially false and misleading when made.

190. On March 13, 2025, the Company filed its Annual Report with the SEC on Form 10-K for the fiscal year that ended on December 31, 2024 (the "2024 10-K"). Shukla and Broadfoot signed the 2024 10-K. That filing contained the same false and misleading statements set forth in Paragraph 159. These statements were

materially false and/or misleading when made for the same reasons set out in Paragraph 160.

191. The 2024 10-K also falsely represented that the Phase 1b/2a trial established Proof of Concept, and again made false statements about dose response and efficacy:

> Advance efzofitimod toward regulatory approval in pulmonary sarcoidosis. Based on the positive results and clinical proof-of-concept from our efzofitimod Phase 1b/2a clinical trial in September 2021, we believe we can expedite development of efzofitimod for pulmonary sarcoidosis toward regulatory approval. In July 2024, we completed enrollment of the EFZO-FIT study. Topline data from the EFZO-FIT study are anticipated in the third quarter of 2025, and our strategy for the advancement of efzofitimod includes submitting data from the EFZO-FIT study to the FDA, which we expect to serve as the basis for U.S. regulatory approval.
>
> ***
>
> In September 2021, we announced positive results and clinical proof-of-concept from the Phase 1b/2a clinical trial in 37 patients with pulmonary sarcoidosis. These data were subsequently presented at the ATS International Conference and published in the peer reviewed journal CHEST in 2022. Efzofitimod was safe and well-tolerated at all doses with no drug-related serious adverse events or signal of immunogenicity. Additionally, the study demonstrated consistent dose response for efzofitimod on key efficacy endpoints and improvements compared to placebo, including measures of steroid reduction, lung function, sarcoidosis symptom measures and inflammatory biomarkers.
>
> ***
>
> We have published additional analyses of data from this study. The study demonstrated consistent dose response for efzofitimod on key efficacy endpoints and improvements compared to placebo, including measures of steroid reduction, lung function, pulmonary sarcoidosis symptom measures and inflammatory biomarkers. These data were presented at the American Thoracic Society (ATS) International Conference and published in the peer-reviewed journal CHEST during 2022. In October 2024, the same published data for efzofitimod was featured in the Best of

> CHEST Journals session at the CHEST 2024 Annual Meeting.

192. The statements identified in Paragraph 191 were materially false and/or misleading when made because the Phase 1b/2a trial data did not demonstrate a Proof of Concept because: (a) mere directionality is insufficient to demonstrate Proof of Concept; (b) dose response was lacking because the numerical trends were not statistically significant; and (c) the CHEST study did not support Proof of Concept, but instead found that the difference between Efzofitimod and placebo was "statistically nonsignificant" at every dose tested, which could "be considered only as hypothesis generating." A reasonable investor reading the 2024 10-K would have encountered the phrase "clinical proof-of-concept" alongside references to the CHEST study and naturally concluded that the peer-reviewed literature supported Defendants' efficacy claims. In reality, the CHEST study's actual findings contradicted Defendants' characterization, but understanding this contradiction required the ability to interpret confidence intervals, p-values, and effect sizes in the context of a small-sample clinical trial — skills that even a sophisticated investor would not be expected to possess.

193. Also on March 13, 2025, Defendants attended a conference call to announce the Company's financial results for the fourth quarter of 2024 and the full year 2024. During this earnings call, Shukla falsely stated that the purported FDA-recommended change in measuring the primary endpoint would not impact the overall power of the Phase 3 trial:

> As part of our planning for the Phase 3 readout for EFZO-FIT, we recently held a Type C meeting with the U.S. Food and Drug Administration, or FDA. The main objective of this meeting was to discuss the statistical analysis plan, or SAP, for the study, including how the primary and secondary endpoints are assessed statistically. For the primary endpoint, we determined how steroid reduction will be analyzed in the SAP.
>
> As we previously discussed, we initially proposed that we measure steroid reduction based on calculating the average daily steroid dose between week 12 and Week 48, which is

> the protocol-specified post-steroid taper period. We viewed this as a conservative way of measuring steroid reduction in the study. Based on FDA feedback, we will now measure steroid reduction as the absolute change from baseline to Week 48. ***We feel this change creates a more simplified assessment to capture potential steroid delta between groups. The statistical powering for this study remains intact, and we are pleased with the clarification around how we will measure steroid reduction***.

194. The statements identified in Paragraph 193 above were materially false and/or misleading when made because: (a) they created the misimpression that the Phase 3 study remained powered at or over 90%; (b) they omitted that Defendants had departed from industry practice and FDA guidance recommending that they assume a more conservative treatment effect than the Phase 1b/2a results showed, because small studies like that one tend to overstate a drug's true effect; (c) as Dr. Abrouk explains, Defendants instead used assumptions that inflated the Phase 1b/2a results and correspondingly reduced the required number of participants to 268 patients; and (d) the 90% power Defendants claimed required at least 369 patients to achieve, and could not be achieved with the 268 patients actually enrolled.

195. Analysts adopted Defendants' powering representations wholesale. On March 13, 2025, Wells Fargo reiterated its "Overweight" rating and $17 price target, describing it as a "Top Pick." Cantor Fitzgerald reported that "[t]he trial is 90%+ powered to show absolute steroid reduction of ~3 mg/d" and noted that "if the drug is working, these differences in the statistical analyses on the primary endpoint will not matter."[36] On March 14, 2025, Jefferies maintained its "Buy" rating and $9.00 price target.[37]

196. During the same earnings call, Shukla was again directly asked by an analyst about the purported FDA-recommended change in measuring the primary

---

[36] *See* Prakhar Agrawal, *aTyr Pharma, Inc. (ATYR): Some Important Updates Relevant for P3 Pulmonary Sarcoidosis*, CANTOR FITZGERALD, March 13, 2025.

[37] *See* Roger Song, *aTyr Pharma (ATYR): [4Q24] Pulmonary Sarcoidosis Pivotal Ph3 Aligns Stat Analysis Plan with FDA*, JEFFERIES, March 14, 2025.

endpoint, and Shukla falsely claimed that the trial remained powered over 90% despite the change and misleadingly asserted that the change provided a "better framework":

> **Question - Derek Archila (Analyst):**
>
> Hey, there. Thanks for taking the questions and congrats on all the progress. ***So, just first question, just maybe Sanjay, can you shed some light on how measuring the absolute change in steroid reduction at baseline now to week 48 versus the current way that you had set it up in terms of the average cumulative steroid dose, how does that impact the trial? I know you noted the powering remains intact, but I guess, maybe just remind us, the powering of the trial***, and I have a follow-up.
>
> **Answer - Shukla:**
>
> Sure, Derek. So, previously, as I mentioned, we were looking at the average steroid dose in that week 12 through Week 48 period, basically taking the patient diary information from every single day they report their prednisone and dividing by the number of doses. It's a fairly conservative way of looking at all the peaks and valleys combined with our steroid taper and that protocol that's occurring simultaneously to that treatment period.
>
> But after some feedback and discussions with the FDA, the view was to look at just the change from week 0 to Week 48. This is something that we're very happy with. I think in many ways this allows us to simplify the manner in which we analyze our data. It allows us to look simply at the starting dose, essentially, and the ending dose. Remember at that -- during this period, we're trying our best to taper patients and continue to re-taper to zero. The assumption now is many of those peaks and valleys, by the time the study ends, should allow us to potentially maximize the steroid delta that we see in these patients.
>
> ***With regard to powering, it remains over 90%. 90% power that either 3 milligram or the 5 milligram dose, shows a stat sig steroid reduction compared to placebo. That has not changed. And with focusing now on the absolute change as opposed to percent change, we think that's also a better framework that's more relevant to patients and providers.***

197. The statements identified in Paragraph 196 were materially false and/or misleading when made because: (a) according to Dr. Abrouk's calculations, which

are supported by industry practice and FDA guidance, achieving "over 90%" power required 369 enrolled patients, not the 268 Defendants enrolled; and (b) even assuming the study was adequately powered overall, Defendants omitted to disclose that: (i) the SAP allocated to the 5 mg/kg arm 90% of the trial's available margin for error, or "alpha," and to the 3 mg/kg arm only 10%, meaning that the 3 mg/kg dose needed to clear a threshold almost ten times more demanding to be deemed statistically significant; (ii) that allocation left the 3 mg/kg arm with only a 25.9% to 45.8% chance of reaching statistical significance under the SAP's own assumptions, meaning it was more likely than not to fail even if Efzofitimod worked exactly as Defendants predicted; and as a result, (iii) the trial did not have "90% power that either 3 milligram or the 5 milligram dose, shows a stat sig steroid reduction compared to placebo" because nearly all of the realistic chance of success was given to the 5 mg/kg arm.

198. In response to similar questions from another analyst, Shukla repeated that the change in measuring the primary endpoint would not impact the trial's power, but would instead allow aTyr to "maximize the difference here":

> **Question - Prakhar Agrawal (Analyst):**
>
> Hi. Thank you for taking my questions and congrats on the progress. So firstly, I think in the Phase 1/2 for the 5 milligram per kg dose, the 1.6 milligram per day steroid reduction that was seen was during the post-taper period. So if you can remind us, what would you see in the overall time period based on the new definition here? That's my first question.
>
> And the second question, maybe if you mentioned that the powering remains intact, but did the powering decrease versus the initial assumption that may have been very conservative to begin with? And lastly, if you can comment on what did the FDA say on FEV1 in the Type C meeting, or was there any discussion around that? Thank you so much.
>
> **Answer - Shukla:**
>
> Yes. I'll take the last part first. Little to no discussions on PFTs. I think this speaks to a much greater interest in steroid

> reduction and frankly, the Kings Sarcoidosis. So with regard to FEV1 specifically that is an important PFT for obstructive disease, and many of these patients, of course, have obstructive disease. We'll look at that again as a tertiary endpoint. ***But my general sense is there's much more of a focus and we had much more of a discussion around steroid reduction. You asked around powering, again, the powering assumptions still remain the same. If anything and I'm going to probably have to set some time aside with you and our biostatistician, the powering remains the same, over 90% powered.*** We may, in fact, be able to, as I've said before, looked for a 3 milligram and 3.5 milligram percent absolute difference -- excuse me, not percent.
>
> Now I think it's probably skewing closer to 3 milligrams***. So even with the same powering assumptions, this new way of analyzing the data may allow us to, as I said, potentially maximize the difference here, maybe not even as high a bar, slightly lower, but that's something that we'll confirm. And again, I want to keep the powering here at 90%.***

199. The statements identified in Paragraph 198 were materially false and/or misleading when made because: (a) Defendants' "powering assumptions" inflated the Phase 1b/2a results by overstating both how much better Efzofitimod performed than placebo and how consistently patients responded to it; (b) those inflated assumptions produced an artificially low enrollment target of 268 patients; and (c) according to Dr. Abrouk's calculations, Phase 3 required at least 369 patients to achieve 90% power.

200. Analysts covering aTyr during the Class Period noted that "mgmt held a Type C meeting with the FDA earlier this year where it was decided that primary endpoint would be assessed as absolute change from baseline to Week 48" but "that EFZO-FIT is 92% powered to show a stat sig" and "[t]he trial is 90% + powered to show absolute steroid reduction delta of ~3 mg/d. Less variability towards the end of the trial on steroid reduction should also increase the trial's power."[38]

---

[38] *See* Yasmeen Rahimi, *aTyr Pharma (ATYR), Takeaways from Our NYC Investor Meetings with Management*, PIPER SANDLER, April 20, 2025; Prakhar Agrawal, *aTyr Pharma, Inc. (ATYR) Takeaways from aTyr Webinar*, CANTOR FITZGERALD, April 23, 2025.

201. On May 7, 2025, the Company filed its financial results for the first quarter of 2025 on SEC Form 10-Q. The May 2025 10-Q was signed by Shukla and Broadfoot. That filing contained the same false and misleading statements as those set forth in Paragraph 159. These statements were materially false and/or misleading for the same reasons set out in Paragraph 160.

202. On May 21, 2025, following a management dinner hosted by Leerink Partners at the American Thoracic Society 2025 conference, Leerink memorialized direct statements from Shukla reflecting that the primary endpoint change was materially positive for the Company: "[m]gmt. explained that statistical powering of the trial has improved ~10% due to the endpoint tweak."[39] Leerink further reported that management could see "distinct clustered groups for OCS dose at end of study."

203. The statements identified in Paragraph 202 were materially false and/or misleading when made because: (a) Defendants' public statements about seeing "distinct clustered groups" are contradicted by the post-Class Period admissions that confirm there was no separation between the placebo and treatment arms in or around May 21, 2025; and (b) based on the patient-level OCS data Defendants admitted they had access to during the Class Period, there was no basis to express optimism about separation regardless of whether Defendants had access to blinded or unblinded data.

204. On June 5, 2025, Defendants participated in the Jefferies Global Healthcare Conference. Analysts once again asked Shukla about the implications of the change in measurement for the primary endpoint, and Shukla responded that the change increased the power to detect a difference and was thus "materially positive" for aTyr:

> **Question - Roger Song (Analyst):**
>
> Got it. Okay. All right. That's good. And then another update, not that reason, but ***I believe in the last earnings***

[39] *See* Faisal A. Khurshid and Matthew Cowper, *aTyr Pharma, Inc. ATS: 2025: Mgmt. Dinner Provides Several New Bullish Insights on EFZO-FIT*, LEERINK PARTNERS, May 21, 2025.

***call, it seems you got some feedback from the FDA into the statistical plan. So maybe just give us a recap. What's the recommendation from the FDA? It seems to play in favor to the trial design. So tell us about the implication as well***.

**Answer - Shukla:**

Sure. So we, as typically most sponsors do, before you have a major Phase 3 readout, you're going to lock down your statistical analysis plan. So you have a quick Type C meeting with the stats group just to make sure that everything, all your ducks are in a row. You want to do as much pre-hoc planning in your statistical analysis plan to avoid a lot of *post-hoc* analyses.

Our primary endpoint was and always, it has not changed, and that is looking at reduction of steroids. The manner in which we proposed to look at this change was to compare baseline values for each cohort to the reduction that you observe in the end of the trial. And the previous version was to look at an average of the last nine months. We know what dose each patient was on. We take that number. We add it up and divide by the number of days. So it's an area under the curve type of approach, very, very conservative way to look at all the waxing and waning you might see in a steroid population, steroid-treated population.

What the FDA advises, let's just simplify here and look at the last four weeks. So when you compare that end dose, don't need to take an average of the last nine months, just look at the last month. There is emerging evidence that the FDA wants sponsors in Phase 3 to look at change from baseline in this standard manner.

***The commentary was, this just simplifies things, just focus at the end. What this does for us is frankly, because it reduces the variability, not to get too statistically wonky, but the standard deviation will be lower at the end, which in turn actually increases the power for us to detect now a smaller difference.***

***So yes, Roger, this materially is slightly better. The threshold now to show stat sig is 0.4 milligrams, 0.5 milligrams less than it was two months ago. So this clarification, I think, is an important checkbox. It's materially, I think, incrementally positive for us. And it also, as I said, allows us to look at things in a simplified manner.***

205. The statements identified in Paragraph 204 were materially false and/or misleading when made because: (a) standard deviation measures how widely

patients' results differ from one another, and the wider that spread, the harder it becomes to distinguish a real drug effect from ordinary variation between patients, meaning the higher standard deviation more than likely reduced the trial's power rather than increasing it; (b) Defendants had no basis to accurately or reliably predict the standard deviation the new endpoint would produce in Phase 3 because they relied on a 37-patient Phase 1b/2a study in which the 5 mg/kg arm enrolled only 9 patients, which was extraordinarily small to reliably estimate variability in a 268-patient trial; and (c) the standard deviation was not "lower at the end" as even the SAP retained the same assumed standard deviation of 6.

206. Later during the Jefferies Global Healthcare Conference, Shukla stated that the Phase 3 trial was "always overpowered" and claimed that aTyr had "two shots on goal" to demonstrate statistical significance:

> **Question - Roger Song (Analyst):**
>
> Got it. And then just remind us what's the power assumption right now. So -- and then this is an absolute reduction, not a percentage reduction.
>
> **Answer - Shukla:**
>
> ***With regard to powering, the trial is always overpowered***. We're trying to go in with a single pivotal approach. ***So the trial is powered more than 90% to show either 5 milligrams per kilogram of efzofitimod or 3 milligrams a kilogram of efzofitimod monthly is statistically superior to placebo***. ***So we have an opportunity of, I would say, two real live efficacious doses, two shots on goal to test each of them to see if one or both beats placebo***.

207. The statements identified in Paragraph 206 above were materially false and/or misleading when made because: (a) the SAP allocated 90% of the available alpha to the 5 mg/kg comparison and only 10% to the 3 mg/kg comparison, requiring the 3 mg/kg arm to clear a significance threshold almost ten times more demanding than the threshold for the 5 mg/kg arm; (b) applying the SAP's own assumptions, the 3 mg/kg arm was powered only within a range of 25.9% to 45.8%; and as a result, (c) the Phase 3 trial was not "always overpowered" or "powered more than 90%" to

show that both doses were "statistically superior to placebo." Nor did the Phase 3 trial have "two shots on goal" or "two real live efficacious doses."

208. Analysts repeated and relied upon Shukla's representations that the trial was overpowered. On June 5, 2025, Piper Sandler reported that the trial was "powered at >90% on primary endpoint to show stat sig ~2.5–3 mg/day reduction for the 3 mg/kg and 5 mg/kg dose cohorts vs placebo."[40] On June 20, 2025, Wells Fargo raised its price target from $17 to $25 and reiterated aTyr as a "Top Pick," premised on "increased confidence" in the Phase 3 readout.[41] On August 22, 2025, Jefferies raised its price target from $9 to $17 and its upside scenario to $25, concluding that the Phase 3 trial had a "Good Chance to Win."[42] Leerink maintained its $16 price target and estimated that a miss on the primary endpoint would result in "80-90% downside."[43]

209. On June 26, 2025, following a non-deal roadshow in Texas, Defendants told analysts at Leerink Partners that "***they see separation and grouping*** in the blinded data for the steroid dose post-taper.[44] While the data are blinded, ***mgmt. noted that seeing these 'clusters forming' gives a degree of confidence that some patients are doing quite well (hopefully on drug) and others are needing steroid rescue (hopefully on placebo).***"[45]

---

[40] *See* Yasmeen Rahimi, *aTyr Pharma (ATYR): Takeaways from Our Well Attended NYC Investor Dinner*, PIPER SANDLER, June 5, 2025.

[41] *See* Derek Archila et al., *aTyr Pharma, Inc. (ATYR): Deep Dive Previewing Efzofitimod's Ph3 in Pulmonary Sarcoidosis; Raising PT to $25 on Increased Confidence, Top Pick*, WELLS FARGO SECURITIES, June 20, 2025.

[42] *See* Roger Song, *aTyr Pharma (ATYR): [Data Preview] Efzo Ph3 in Mid-Sept Has Good Chance to Win PS Approval*, JEFFERIES, August 22, 2025.

[43] *See* Faisal A. Khurshid and Matthew Cowper, *aTyr Pharma, Inc. (ATYR): EFZO-FIT or Flat — Scenarios for the Ph 3 Binary*, LEERINK PARTNERS, August 22, 2025.

[44] *See* Faisal A. Khurshid and Matthew Cowper, *aTyr Pharma, Inc. ATYR, NDR Takeaways: Feeling Bullish in Texas*, LEERINK PARTNERS, June 26, 2025.

[45] *Id.*

210. The statements identified in Paragraph 209 above were materially false and/or misleading when made because: (a) Defendants' statements concerning separation and clusters are contradicted by the post-Class Period admissions that confirm there was no separation between the placebo and treatment arms in or around June 26, 2025; and (b) based on the patient-level data Defendants admitted to possessing, there could have been no basis to express "confidence that some patients are doing quite well and others are needing steroid rescue."

211. On August 4, 2025, Defendants met with analysts from Cantor Fitzgerald and again claimed to "continue to see separation in performance of patients."

212. The statement identified in Paragraph 211 above was materially false and/or misleading when made because: (a) it is contradicted by the post-Class Period admissions that confirm there was no separation between the placebo and treatment arms in or around August 4, 2025; and (b) based on the data, there could have been no basis to claim to "continue to see separation in performance of patients."

213. On August 7, 2025, the Company filed with the SEC its financial results for the second quarter of 2025 on Form 10-Q. The August 2025 10-Q was signed by Shukla and Broadfoot. That filing contained the same false and misleading statements as those set forth in Paragraph 159. These statements were materially false and/or misleading for the same reasons set out in Paragraph 160.

## VII. THE TRUTH EMERGES

214. On September 15, 2025, before market open, aTyr issued a press release announcing topline results from its Phase 3 trial. In conjunction with the announcement, aTyr hosted an investor presentation.

215. During the investor presentation, Shukla attempted to correct his prior statements. He first admitted that the "study, however, did not meet the primary endpoint of change from baseline in mean daily oral corticosteroid or OCS dose at Week 48." He then went on to try to explain how his earlier confidence in how highly

powered the study was could be squared with such a result, without ever using the term "power":

> In our modeling, we assumed that patients on Efzofitimod would taper from baseline to an average daily prednisone dose between one to four milligrams, with placebo expected to taper to between four to seven. So, the drug performed accordingly to what we projected. However, we did not achieve statistical significance as the placebo tapering outperformed even our most aggressive modeling. Another important assessment of steroid reduction in the study was patients that achieved complete steroid withdrawal at Week 48.

216. The above-cited investor presentation and statements made by Shukla contradicted prior statements made by Defendants in previous press releases and presentations. Importantly, Shukla had previously promised that the Phase 3 trial would be a "catalyst" to removing steroid usage from pulmonary sarcoidosis patients' treatment plans.

217. Analysts covering aTyr were surprised by the Company's announcement that the Phase 3 trial missed its primary endpoint. For example, Wells Fargo drastically lowered its price target ***by 96%***, from $25 per share to $1 per share, noting it would "await further clarity before getting constructive."[46] Similarly, H.C. Wainwright & Co. issued a research note on aTyr's trial results,[47] stating in relevant part that:

> [aTyr] Management notes that the higher than expected placebo results, which were greater than even the company's most aggressive modeling predicted, were a key driver of this statistical[] miss.

---

[46] *See* Derek Archila, Eva Fortea Verdejo, Simone Nasroodin, and Hao Shen, *aTyr Pharma, Inc. (ATYR): Downgrading to Equal Weight on Efzofitimod Phase 3 Failure, Price Target Moves to $1, WELLS FARGO SECURITIES*, September 15, 2025.

[47] *See* H.C. Wainwright & Co., *aTyr Pharma, Inc. (ATYR): FDA to Drive Future Now After Top Line Miss With EFZO-FIT; Downgrade to Neutral*, H.C. WAINWRIGHT, September 15, 2025.

218. As a result, investors and the market immediately reacted to these revelations. The price of aTyr's common stock declined from a closing price of $6.03 per share on September 12, 2025, to $1.02 per share on September 15, 2025, a decline of 83% in just a single trading day.

219. On May 11, 2026, aTyr announced that the FDA had rejected the path to approval for Efzofitimod, and that the Company would need to run a completely new trial to support Efzofitimod's efficacy.

220. On that day, Defendants also announced that they had abandoned the steroid-reduction primary endpoint, and replaced it with a change from baseline in FVC at Week 48, and change from baseline in KSQ-Lung at Week 48 as the key secondary endpoint. Shukla stated that "the FDA indicated FVC to be a direct measure of function" and that the Company "concluded FVC is the more appropriate primary endpoint" for the next study. This directly contradicted Defendants' prior representations. On December 3, 2024, Shukla told investors that, based on FDA feedback, "forced vital capacity is an important endpoint, but probably better slotted as a secondary endpoint," and Leerink reported on March 10, 2025, that "the FDA has endorsed any level of steroid reduction as meaningful and walked the company away from using FVC."

221. Defendants also conceded that the KSQ-Lung endpoint, which was added as a secondary endpoint in the May 2025 amendment, was not validated for regulatory use.

222. The May 11, 2026 disclosures thus confirmed that the endpoint architecture Defendants had represented as stable throughout the Class Period had in fact been fundamentally altered, and that the KSQ-Lung endpoint Defendants added as a secondary endpoint in May 2025 was not validated for the regulatory purpose it was intended to serve. These admissions directly corroborate Dr. Abrouk's Opinion 8.

223. In addition, during a conference call with analysts held on May 11, 2026, Shukla conceded that aTyr needed to run a 54-week study with 372 trial participants. This concession bolsters Dr. Abrouk's opinion that many more patients were required to participate in Phase 3 to ensure the trial was sufficiently powered to demonstrate efficacy.

224. Shukla further conceded that aTyr needed to revise its assumptions about power to "hit stat sig with multiple zeros after the decimal point so that there's really no question with regards to the utility of [E]fzofitimod."

225. When asked how the new trial would be funded, Shukla did not provide an answer, stating only that aTyr was "currently exploring various avenues to finance this Phase 3 effort" and that "right now, that's TBD as we start to work through what's the best pathway."

226. The market reacted negatively to these disclosures. aTyr common stock closed at $0.95 per share on May 11, 2026. On May 12, 2026, the stock opened at $0.80, fell to an intraday low of $0.51, and closed at approximately $0.53 per share — a single-day decline of approximately 44%.

227. Before the market opened on May 15, 2026, aTyr announced its financial results for the first quarter of 2026. It reported a net loss of $0.11 per share, and $68.3 million in cash and cash equivalents.

228. Executing a global, 372-patient, multi-center Phase 3 study over a 54-week observation period represented a cash requirement that structurally outstripped the Company's remaining runway. The market understood that aTyr would be forced into a highly dilutive equity raise to fund the new trial.

229. On this news, aTyr common stock declined another 10% from approximately $0.56 on May 14, 2026 to $0.50 on May 15, 2026, reaching historic lows.

## VIII. ADDITIONAL FACTS PROBATIVE OF SCIENTER

### A. Core Operations

230. The successful development and commercialization of Efzofitimod were the Company's core operations. aTyr is a small company with only 56 full-time employees — only 35 serve in roles related to research, development, clinical, manufacturing, and regulatory affairs — as noted in aTyr's annual report filed with the SEC on Form 10-K on March 5, 2026. The Phase 3 trial for Efzofitimod was the Company's most advanced clinical trial during the Class Period, and Efzofitimod was the first drug Defendants intended to bring to market if Phase 3 succeeded.

231. Moreover, aTyr had no revenue or profits throughout the Class Period. As it admitted in its 2024 10-K, "[w]e have never generated any revenue from product sales and may never be profitable." Consequently, the Company's success was largely dependent on the success of the Phase 3 trial for Efzofitimod.

232. Conversely, the upside from Efzofitimod was huge, as noted by analysts covering the Company, who observed that "[g]iven efzo could be the first approved drug, we think it can take upwards of ~50% share at biologic pricing. Our ~$2B US peak est is double consensus' of $1.1B."[48] In fact, during the Class Period, aTyr claimed that Efzofitimod could generate up to $5 billion if the drug was approved.[49]

233. Indeed, after aTyr announced that the Phase 3 trial had failed, analysts interpreted the results as a major risk to the Company's business prospects, with one analyst remarking that after the failed clinical trial "[w]e still find it hard to see a path

---

[48] *See* Derek Archila, Eva Fortea Verdejo, and Adam Vogel, *aTyr Pharma, Inc. (ATYR) Investors Underappreciating Efzofitimod Which Offers Excellent Entry Point-Initiating Overweight with a $17 PT*, WELLS FARGO SECURITIES, October 4, 2024.

[49] *See, e.g.*, Transcript, aTyr Pharma Conference Call, September 15, 2025 (Shukla stating that "the opportunity for efzofitimod in sarcoidosis and other ILDs represent $2 billion to $3 billion in peak sales"); aTyr Pharma, Inc. Schedule 14A (Mar. 26, 2026) (describing Efzofitimod for ILD as a "$2-5b market opportunity").

forward" and that the "key downside risk is an inability to identify or fund a path forward."[50]

234. Accordingly, a failed clinical trial that could invalidate aTyr's relevance in the eyes of the market supports a strong inference that the subject of the fraud was so important that it would be absurd to assume that Defendants did not know the specific facts that rendered their statements false and misleading when made.

**B. Defendants Held Themselves Out as Knowledgeable About the Concealed Information**

235. Shukla and Broadfoot spoke publicly and in minute detail about the Phase 1b/2a and Phase 3 clinical trials for Efzofitimod. *See* ¶¶156-206. Shukla regularly addressed pointed questions from analysts concerning the clinical trials and responded with a high degree of specificity to demonstrate that he was aware of the facts that rendered his statements misleading when made.

236. Shukla personally led aTyr's pre-readout interactions with the FDA, and, by his own account, with regulators in Europe, Japan, and Brazil, regarding the design, endpoint hierarchy, and SAP for the Phase 3 trial.[51]

237. He also represented himself as a hands-on manager. For instance, at the December 5, 2024 Piper Sandler 36th Annual Healthcare Conference, Shukla stated that he was personally involved in "QC and making sure that there is a [great] amount of stringency around quality control for data integration as data comes in."

238. On March 13, 2025, at the earnings call held to announce aTyr's financial results for the fourth quarter and full fiscal year 2024, Shukla made specific statements demonstrating that he possessed a high degree of knowledge and skills

---

[50] *See* Faisal A. Khurshid and Matthew Cowper, *aTyr Pharma, Inc. ERS 2025: Interesting Tidbits from EFZO-FIT Presentation, Path Fwd. Still Tough*, LEERINK PARTNERS, September 30, 2025.

[51] *See, e.g.*, Stifel Healthcare Conf., Nov. 18, 2024 ("I then went to European regulators, Japanese regulators, even regulators in Brazil to make sure that this approach made sense."); Q4 2024 earnings call, March 13, 2025 (describing the Type C meeting with the FDA to finalize the SAP).

about clinical trial design because he was a biostatistician capable of appreciating technical details:

> Sure, yes. Great questions. I will take the first one and say that the market research is not necessarily really connected to this type of meeting. ***This is a little inside baseball biostatistics that typically before you lock your database, you want to have all the rules set up with the biostats division. And as a biostatistician, it's important that we really agree on all the pre hoc analyses. I think far too many times in biotech, we implement rules and then after data comes out, we start to do post hoc analysis and cherry pick and cut and slice the data. And I wish more [biostatisticians] wouldn't do that***.

239. Later on the same call, answering a question about how Phase 3's primary endpoint was measured, Shukla stated that:

> Typically, what you're looking at is a trailing average of say 28 days. ***So that's again, a very wonky biostats and a programming question that you've asked there***.

240. That Defendants had intimate knowledge of all the underlying facts that rendered their representations false and misleading when made is supported by analysts' reactions.

241. In a March 10, 2025 report, analysts from Leerink Partners explained how the Defendants had attempted to undercut any potential skepticism of the clinical trials for Efzofitimod by claiming that the structure of Phase 1b/2a supported meaningful results and Phase 3 was further designed to "amplify the effect size."[52] Specifically, the analysts summarized Defendants' intimate knowledge of Efzofitimod's clinical trials as follows:

> Investors have questioned the realness of the Ph 1b/2a data given small n-size and overlapping error bars on certain endpoints. Management countered that seeing a consistent effect across endpoints and consistent dose response in such a small study is actually highly supportive, as this consistency is unlikely to occur by chance at this n-size (i.e., given standard deviation). ***They also emphasized that the***

[52] *See* Faisal A. Khurshid and Matthew Cowper, *aTyr Pharma, Inc. ATYR – Takeaways from the Leerink Partners Global Healthcare Conference*, LEERINK PARTNERS, March 10, 2025.

> ***Ph 3 trial is designed to amplify the effect size by optimizing patient selection, extending treatment duration, and making the steroid-tapering protocol more aggressive, which are all things that should help the drug arms and hurt the placebo arm (vs the Ph 1b/2a).*** On the steroid reduction endpoint being used in EFZO-FIT, management noted the FDA has endorsed any level of steroid reduction as meaningful and walked the company away from using FVC. Regarding the rationale for testing efzo in pulmonary sarcoidosis, management noted it was informed by the drug's preclinical effects on myeloid cells, which are implicated in the disease, and by the expression of the NRP2 target in sarcoid granulomas. We also asked about potential anti-drug antibody (ADA) risk, and management explained this is a theoretical concern but this has not arisen in the prior study and has been monitored in EFZO-FIT.

242. Analysts appreciated, trusted, and adopted Shukla's statements because of his expertise as a biostatistician and his deep knowledge of Efzofitimod's clinical trials. After aTyr changed how the primary endpoint was measured and Shukla claimed that the statistical powering remained "intact," at a private event, analysts noted that "[m]gmt. explained that statistical powering of the trial has improved ~10% due to the endpoint tweak."[53] Critically, the analysts reported that, based on their conversations with Defendants, the analysts had learned that Defendants had "line of sight into general trends at end of the study, including portion of patients achieving full taper and discontinuation rates…which implies mgmt. has a decent read on study likelihood of success."[54] And from this specific knowledge, the analysts concluded further that Defendants saw "distinct clustered groups for OCS dose at the end of the study" and that "[o]verall, we thought mgmt.'s body language was highly positive on what they are seeing from EFZO-FIT."[55]

243. That the Individual Defendants held themselves out as knowledgeable about the concealed matters allows only two inferences: that they actually possessed

---

[53] *See* Faisal A. Khurshid and Matthew Cowper, *aTyr Pharma, Inc. ATS: 2025: Mgmt. Dinner Provides Several New Bullish Insights on EFZO-FIT*, LEERINK PARTNERS, May 21, 2025.

[54] *Id.*

[55] *Id.*

the knowledge claimed but deliberately chose to withhold material adverse information from investors; or that, despite holding themselves out as knowledgeable, they chose not to inform themselves of the truth and were deliberately reckless.

**C. Defendants Had Access to Granular Data Unavailable to Investors**

244. Although the Phase 3 trial was a randomized, purportedly double-blind, placebo-controlled trial, Defendants repeatedly represented, in investor meetings, at analyst conferences, and on transcribed fireside chats, that they had access to critical data unavailable to investors and the public, including PGA scores, daily OCS doses, steroid curves, FVC measurements, and safety/adverse-event information, for every enrolled patient throughout the Class Period.

245. On December 3, 2024, at the 7th Annual Evercore ISI HealthCONx Conference, Shukla described Defendants' real-time oversight of the PGA-guided steroid titration and represented that: "every two weeks, we are working with the PIs to say, 'Look, if there's any worsening, you've got to rescue these patients.' And it's that rescue that we're frankly counting on to occur more in the placebo population compared to the treatment population."

246. On December 5, 2024, at Piper Sandler's 36th Annual Healthcare Conference, Shukla admitted that aTyr had visibility into individualized patient data in the Phase 3 trial: "Being able to visualize, I would say our data visualizations are two standard deviations better than any biotech company because we just are a very data-centric company. ***We look at every patient. We're actively monitoring***." Shukla continued that this per-patient visibility was the reason "things like the [Expanded Access Program] were implemented," adding that "we saw patients, we see patients who have been able to get off steroids and maintain that."

247. At the same event, Shukla further admitted that Defendants had a "stranglehold on the data" and that they possessed "patient tabulation summaries on

any patient" and that they "can look at it" and they were seeing "patients who have been able to get off steroids and maintain that for nine months."

248. On the Q4 2024 earnings call on March 13, 2025, Shukla stated that Defendants had dose-level information for each enrolled patient: "we were looking at the average steroid dose in that Week 12 through Week 48 period, basically taking the patient diary information from every single day they report their prednisone and dividing by the number of doses."

249. On May 21, 2025, following a management dinner hosted by Leerink Partners at the American Thoracic Society 2025 conference, Leerink reported that: "We learned that mgmt. has line of sight into general trends at end of study including proportion of patients achieving a full taper and discontinuation rates. While mgmt. would not share specifics, we learned they can see what % of patients are on 0mg OCS at end of study, which is interesting as it implies mgmt. has a decent read on study likelihood of success … mgmt. knows (but cannot disclose) what % of patients are at 0 mg OCS (steroids)."

250. Leerink further stated that: "Mgmt. also shared they see distinct clustered groups for OCS dose at end of study. While the company is still blinded we think the clustering has a positive interpretation (i.e., there are buckets of patients achieving various end-of-study outcomes as one would expect for 5 mg vs. 3 mg vs. pbo)."

251. On June 5, 2025, at the Jefferies Global Healthcare Conference, Shukla confirmed on the record that Defendants were already observing cluster patterns in the Phase 3 trial well before the results were formally announced on September 15, 2025. Asked about lung-function endpoints, Shukla stated: "We are already seeing clusters in our trial, and to be honest, we're going to look at FEV1. We're going to look at DLCO. We're going to have an arsenal of endpoints ready at our disposal."

252. Later on June 5, 2025, at an investor dinner in New York hosted by Piper Sandler, Defendants described an internal, in-house data platform that provided

management with patient-by-patient visibility into the Phase 3 trial. Analysts from Piper Sandler reported that: "Mgmt highlighted their in-house dashboard that shows blinded patient data across PGA, steroid curves, AEs, FVC, etc. Effectively, this provides a useful tool to stay ***ahead of any possible statistics***, or patient abnormalities and ***further boost conviction in EFZO-FIT execution***."

253. Piper Sandler's June 5, 2025 report further emphasized that Defendants had access to information that allowed them to "stay ahead of any data integrity, statistics, or patient abnormalities."

254. On June 26, 2025, Leerink Partners reported that: "mgmt. noted they see separation and grouping in the blinded data for the steroid dose post-taper. While the data are blinded, mgmt. noted that seeing these 'clusters forming' gives a degree of confidence that some patients are doing quite well (hopefully on drug) and others are needing steroid rescue (hopefully on placebo)."[56]

255. Taken together, the statements identified above — made by Shukla on transcribed analyst fireside chats and memorialized in contemporaneous sell-side notes describing meetings with aTyr management — establish that, well before the Phase 3 trial results were formally announced, Defendants (a) maintained an in-house dashboard capturing patient-level PGA, steroid, FVC, AE, and safety data for every enrolled patient; (b) "cleaned" and "closely scrutinized" data; (c) knew the percentage of patients who had tapered to 0 mg of OCS at the end of the study; and (d) were already able to see "distinct clustered groups" and "separation and grouping" in the end-of-study steroid-dose distribution. None of this information was available to ordinary investors.

---

[56] *See* Faisal A. Khurshid and Matthew Cowper, *aTyr Pharma, Inc. ATYR, NDR Takeaways: Feeling Bullish in Texas*, LEERINK PARTNERS, June 26, 2025.

**D. Shukla's Authorship of the CHEST Study Enhances Scienter**

256. Shukla was a co-author of the CHEST study, and was accordingly aware at all relevant times of what the CHEST study actually reported, and of the limitations expressly recited in it.

257. The CHEST study never concluded that the Phase 1b/2a trial for Efzofitimod established Proof of Concept or provided evidence of efficacy. Instead, the CHEST study found that the difference between Efzofitimod and placebo was "***statistically nonsignificant***" at every dose tested, with adjusted mean differences of +1.2% (1 mg/kg), −2.3% (3 mg/kg), and −12.3% (5 mg/kg) versus placebo ($p>0.05$). It also found that the study did not achieve statistical significance on lung function, improvements in FVC % predicted or DLCO % predicted at the 5 mg/kg dose.

258. Contrary to Shukla's false claim that the small size of the Phase 1b/2a study bolstered its findings, the CHEST study concluded that: "because of the limited number of patients enrolled in this trial, ***these findings should be considered only as hypothesis generating***. These results support further evaluation in prospective trials of efzofitimod in patients with pulmonary sarcoidosis." The peer-reviewed, published conclusion of the CHEST study is only that the Phase 1b/2a trial generated hypotheses for future testing, not that it established Proof of Concept or efficacy trends.

**E. Individual Defendants' Claimed Expertise Supports Scienter**

259. Shukla's decades of experience in the biopharmaceutical industry, including the development of pharmaceutical drugs, further supports scienter.

260. Shukla has a Bachelor of Science in Microbiology and a Master of Science in Epidemiology and Biostatistics from the University of Maryland. He is also an M.D. and went to medical school at the Howard University College of Medicine. Before joining aTyr in 2017, Shukla served as Vice President and Global Head of Integrated Medical Services for Novartis AG, a biopharmaceutical behemoth, where he led global medical affairs operations and had oversight of all

general medicine therapies, both inline and in development. Before that, Shukla served as CEO of RxMD Therapeutics, Inc., a clinical development consultancy that assisted in advancing Proof of Concept for early-stage drug candidates. Prior to that, he served in a variety of clinical development, data analytics and drug safety roles at Vifor Pharma, Ltd. and Aspreva Pharmaceuticals, Corp.

261. Shukla has also publicly represented that he was "trained at Roche Nutley," where, in his telling, "we only moved programs forward into Phase 3 if you see dose response, and you better see dose response with multiple endpoints. And we did that." (Stifel Healthcare Conference, Nov. 18, 2024.)

262. As such, Shukla had significant experience in the relevant fields and in conducting scientific trials to know: (a) the precise technical meaning of terms of art, such as "proof of concept" and "dose response"; (b) the requirements for demonstrating efficacy; (c) the requirements for establishing Proof of Concept; (d) the risk associated with advancing to a Phase 3 trial without actual evidence of efficacy; (e) the risks of changing the secondary endpoint during Phase 3; and (f) the need to disclose a contemporaneous calculation supporting any greater-than-90-percent power assurance. Shukla's deliberate use of these precise scientific terms when speaking to investors — terms whose true meaning he understood but that he knew ordinary investors could not independently evaluate — supports a strong inference that he intentionally exploited the information asymmetry between himself and the investing public.

263. Broadfoot has a Bachelor of Science in Business Administration and Accounting from San Diego State University and is a Certified Public Accountant. Broadfoot serves on the board of directors of Talphera, Inc. and Cue Biopharma, Inc., both biotechnology companies. She previously served on the board of directors of Otonomy, Inc., and Angiocrine Biosciences, Inc. Prior to joining aTyr in 2018 as CFO, Broadfoot was the CFO of Emerald Health Pharmaceuticals, Inc. and Emerald Health Bioceuticals, Inc., where she was responsible for operations and investor

relations, among other functions and responsibilities. Prior to Emerald Health, Broadfoot served as Vice President, U.S. Corporate Controller at GW Pharmaceuticals, Ltd. from May 2016 to January 2017. While at GW Pharmaceuticals, her responsibilities included establishing U.S. commercial operations, overseeing information technology, and implementing U.S. public company financial and accounting standards. Prior to joining GW Pharmaceuticals, Broadfoot served as CFO of Vical, Inc. from October 2004 to March 2013.

264. Consequently, Broadfoot has significant experience in the operations of pharmaceutical companies, including clinical trials, and her previous positions as CFO of other companies allowed her to understand SEC reporting obligations before she signed and filed false and misleading reports with the SEC during the Class Period.

### F. aTyr's Eleventh-Hour Changes to the Phase 3 Trial Are Demonstrative of Scienter

265. According to Dr. Abrouk, modifying an endpoint as late in the game as aTyr did contravenes established practice and is equivalent to "changing a horse in the middle of the race." In Dr. Abrouk's experience, such unexplained late changes are indicative of a faulty original study design or a sponsor's knowledge of negative results.

266. Here, in early 2025, aTyr changed one of the secondary endpoints for the Phase 3 trial from "Percent change from baseline in mean daily OCS dose post-taper" to "Steroid withdrawal rate." The Company also swapped secondary endpoints 1 and 3, so that the subjective patient-reported outcome endpoint, the KSQ-Lung score, was first, and the objective, absolute change in FVC was last.

267. No explanation was provided to investors concerning why these changes were made, either when they were made or when the results of the Phase 3 trial were announced.

268. Dr. Abrouk explains that these changes were likely made with the hope that one of the secondary endpoints could be met since the primary endpoint could

not, allowing Defendants to approach the FDA with some positive results for a secondary endpoint. Defendants could pivot to seek approval of the drug based on a secondary endpoint if the results turned out to be positive for that endpoint. The FDA has sometimes granted approval when the primary efficacy endpoint fails to reach statistical significance, but a secondary endpoint yields better results.

269. The results confirmed that this was precisely the strategy Defendants pursued — and that it failed. When the Phase 3 topline data were announced on September 15, 2025, the newly added "steroid withdrawal rate" secondary endpoint produced nominal p-values of 0.1172 for the 3 mg/kg arm and 0.0919 for the 5 mg/kg arm — neither of which reached the conventional 0.05 threshold for statistical significance. The 5 mg/kg result was the strongest metric Defendants could produce from the reshuffled endpoint hierarchy, yet it still failed to cross the statistical threshold necessary to support an FDA submission. That Defendants added this endpoint mid-trial, promoted it within the hierarchy, and then could only muster a statistically insignificant result underscores that the endpoint reshuffling was a calculated but ultimately futile attempt to salvage a failing trial.

### G. Dr. Abrouk's Expert Opinions Bolster an Inference of Scienter

270. Expert opinions can support scienter if the expert has the relevant experience to possess the information the expert opines upon, and the expert opinions are indicative of Defendants' actual knowledge or reckless disregard for the truth. Dr. Abrouk's analysis easily meets this test. He has decades of experience with clinical trials, including preparing NDAs and BLAs. He has served on DSMBs, and is a biostatistician with practice-specific experience to provide particularized opinions on the matters alleged. For instance, Dr. Abrouk is well-qualified to opine on whether the Phase 3 trial was sufficiently powered given his academic background and work experience in biostatistics.

271. While Dr. Abrouk does not opine as to Defendants' state of mind, the background information and calculations he provides confirm that Defendants acted

with scienter. *See supra* at ¶¶93-155. Dr. Abrouk shows that the statements to investors were without basis, misrepresent terms of art, and that the Phase 1b/2a trial did not establish Proof of Concept, dose response or efficacy. Dr. Abrouk also confirms that the CHEST study analysis and conclusions do not support Shukla's misrepresentations to investors and the hype he created about Efzofitimod.

272. In addition, Shukla is a biostatistician who repeatedly stated that the Phase 3 trial was powered even higher than what was required for a well-controlled Phase 3 study. Dr. Abrouk, also a biostatistician, shows that the Phase 3 trial was, in fact, underpowered, a fact that Shukla knew or recklessly disregarded when he made inconsistent and misleading statements. *See supra* at ¶¶124-146, 167, 177, 193-199, 204-207.

273. Furthermore, Shukla repeatedly claimed how clustering and separation were evident in the patient outcome data throughout the final months of Phase 3, despite Dr. Abrouk confirming that no such separation or clustering existed in the data. *See supra* at ¶¶151-155, 202-203, 209-212.

274. The inconsistency between Defendants' conduct and their representations further supports scienter. Each of the 2024 10-K, Q1 2025 10-Q, and Q2 2025 10-Q represented to investors: "The DSMB reviews concluded that the study could continue unmodified." Yet aTyr itself had modified the study's SAP and primary and secondary endpoints in early 2025 — before filing these quarterly reports with the SEC. While the DSMB's recommendation may have related to safety, Defendants' repeated use of the phrase "continue unmodified" — without any qualification or disclosure that the Company had itself overhauled the trial's SAP and endpoints — created a misleading impression that the Phase 3 trial was proceeding as originally designed. That Defendants chose to highlight the DSMB's all-clear recommendation while simultaneously concealing their own material modifications to the study supports a strong inference that they intended to project an appearance of trial stability that did not reflect reality.

**H. Financial Motive and Opportunity Created by the Jefferies ATM Agreement**

275. The Jefferies ATM Agreement provided Defendants with both a concrete financial motive and an opportunity to artificially inflate aTyr's stock price during the Class Period. Because an ATM program sells shares at prevailing market prices, every dollar of artificial inflation in aTyr's stock price directly increased the amount of capital the Company could raise. As a clinical-stage company with no revenue and no commercial products, aTyr was entirely dependent on capital markets to fund its operations, including the costs of the Phase 3 trial. This created a powerful financial incentive for Defendants to make false and misleading statements designed to inflate the stock price and maximize the proceeds of the ATM offering.

276. The financial data confirms that Defendants acted on this motive. During the Class Period, aTyr raised over $100 million through ATM sales — approximately $40 million in 2024 and approximately $66.4 million in 2025.

277. In December 2024, Defendants expanded the Jefferies ATM program from $65.0 million to $215.0 million — a more than threefold increase — signaling an intent to significantly accelerate capital raising during the very period when Defendants were making their most aggressive misrepresentations about the Phase 3 trial's power and probability of success. Defendants expanded their ATM capacity to raise additional capital while the window of artificial inflation remained open.

278. The acceleration of ATM sales as the stock price peaked further supports an inference of scienter. This spike in selling activity occurred while Defendants were telling analysts that the trial was "always overpowered" and "powered more than 90%" — statements that Dr. Abrouk's analysis shows were false. The timing and volume of these sales, made at the peak of the artificially inflated stock price, provide compelling evidence that Defendants were aware the Phase 3 trial was likely to fail and sought to maximize capital raised before the truth emerged.

## I. Admissions Following the Phase 3 Failure

279. Defendants participated in the European Respiratory Society International Congress in Amsterdam, Netherlands, which took place from September 27 to October 1, 2025. At this event, Daniel Culver, a co-author of the CHEST study, presented data from the Phase 3 trial in a presentation entitled "EFZO-FIT: The Largest Ever Interventional Trial in Pulmonary Sarcoidosis."

280. The presentation included, for the first time, "Change from Baseline in OCS" data for the placebo and treatment arms, which established that there was virtually no separation in change in absolute OCS dose between the three arms, directly contradicting the Defendants' false statements to analysts at the end of the Class Period concerning separation:




| | Placebo<br>N=90 | Efzofitimod 3 mg/kg<br>N=86 | Efzofitimod 5 mg/kg<br>N=88 |
|---|---|---|---|
| LS mean dose at week 48 (mg) | 3.5 | 3.5 | 2.8 |
| LS mean change from baseline (mg) | -7.1 | -7.1 | -7.9 |
| Difference in LS mean (95% CI) | - | 0.0 (-1.5, 1.5) | -0.7 (-2.2, 0.8) |
| *p-value* | - | *0.9804* | *0.3313* |

*Figure 1: Slide 7 of Presentation by Dr. Daniel Culver of Cleveland Clinic for ERS Congress, September 27, 2025 to October 1, 2025, Amsterdam, Netherlands.*

281. During the May 11, 2026 regulatory and clinical update, Shukla conceded that nearly 372 patients needed to be enrolled to adequately power the new trial. His concurrent concession that Defendants fine-tuned their power assumptions to "hit stat sig with multiple zeros after the decimal point so that there's really no question with regards to the utility of [E]fzofitimod" also confirmed that the original

Phase 3 trial lacked the statistical backing Defendants had previously represented to investors.

282. On May 15, 2026, aTyr announced that its $68.3 million cash position was insufficient to fund a global 372-patient, 54-week Phase 3 study.

283. Speaking at the June 25, 2026 Life Sciences Virtual Investor Forum, Shukla also conceded that the original Phase 3 trial was run on a "razor's edge," admitting that the Company "could probably get away with running a trial with closer to, you know, 275 patients like last time," but that doing so meant cutting corners. By explaining that the expanded 372-patient study is designed to secure a "slam dunk P-value" that leaves "no question" of the drug's efficacy, Shukla again confirmed that the original Phase 3 study lacked the robust statistical margin necessary to reliably succeed.

## IX. LOSS CAUSATION AND ECONOMIC LOSS

284. During the Class Period, as detailed herein, Defendants made materially false and misleading statements; engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of aTyr's common stock; and operated as a fraud or deceit on the Class Period purchasers and sellers of aTyr securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of aTyr's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases and/or sales of aTyr's relevant securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages under federal securities laws.

285. aTyr's stock price fell in response to the corrective events beginning first on September 15, 2025, as alleged herein. On this date, Defendants and analysts disclosed information that was directly related to the Defendants' prior misrepresentations and material omissions concerning the design and endpoints of aTyr's Phase 3 trial of Efzofitimod for patients with pulmonary sarcoidosis.

286. On September 15, 2025, before the market opened, aTyr issued a press release announcing that the Phase 3 trial "did not meet its primary endpoint of change from baseline in mean daily [OCS] dose at Week 48." The data revealed what Defendants' false statements had concealed: the trial's primary endpoint had failed because the placebo arm achieved a steroid reduction of 63.3% — far greater than anything Defendants' "most aggressive modeling" had predicted — while the treatment arms achieved reductions of only 67.8% (3 mg/kg) and 73.6% (5 mg/kg), resulting in statistically insignificant differences between treatment and placebo. This was the precise risk that Defendants' misrepresentations about "proof of concept," "dose response," and ">90% power" had concealed from the market. A reasonable investor would have had no way to anticipate this outcome from the publicly available Phase 1b/2a data, because understanding how a small, underpowered preliminary trial could foreshadow a high placebo response in the definitive Phase 3 trial requires specialized training in biostatistics and clinical trial design that ordinary investors do not possess.

287. The market's response was immediate, dramatic, and directly linked to the corrective disclosure. aTyr's stock price collapsed from a closing price of $6.03 per share on September 12, 2025 — the last trading day before the announcement — to $1.02 per share on September 15, 2025, representing a single-day decline of $5.01 per share, or 83%. This decline eliminated over $490 million in market capitalization.

288. The magnitude of the stock price decline is directly attributable to the revelation of Defendants' fraud, not to any independent market forces. On the day of the announcement, the Nasdaq Biotechnology Index (NBI) declined only approximately 1%, demonstrating that the aTyr-specific decline was not driven by broader market conditions. Analyst reactions confirm the causal connection. Wells Fargo Securities, which had maintained an "Overweight" rating and a $25 price target based on Defendants' representations, immediately downgraded aTyr to "Equal Weight" and slashed its price target to $1.00, noting that "shares are trading down

~83% vs. XBI's -1%, which is largely in line with our expectation of -90% for our bear case scenario or on failure of the Ph3."[57] Laidlaw & Company adjusted its target from $30.00 to $3.50.[58] Jones Trading, which had maintained a Buy rating with a $22.00 price target, noted that "[a]pprox. 70% of our NPV valuation comes from efti in pulmonary sarcoidosis."[59]

289. Each of these analysts had previously credited and relied upon Defendants' false representations in setting their bullish price targets. Prior to the corrective disclosure, multiple analysts had repeated Defendants' claims that the Phase 3 trial was "90%+ powered," that "proof of concept" had been "established," and that the Phase 1b/2a data supported "dose response" — the very misrepresentations at the core of this action. For example, Piper Sandler reported that "[t]he trial is 90% + powered to show absolute steroid reduction delta of ~3 mg/d," directly crediting Defendants' representations. Leerink Partners reported that "mgmt. explained that statistical powering of the trial has improved ~10% due to the endpoint tweak," further demonstrating that analysts relied on and transmitted Defendants' false statements to the market. The sudden and extreme reversal of these analyst views upon the corrective disclosure confirms that the inflated stock price was directly attributable to Defendants' misrepresentations and that the economic loss was proximately caused by the revelation of the fraud. That even these trained professionals — with deep expertise in pharmaceutical development and drug trial analysis — were deceived underscores that Defendants' misrepresentations were not

---

[57] *See* Derek Archila, Eva Fortea Verdejo, Simone Nasroodin, and Hao Shen, *aTyr Pharma, Inc. (ATYR): Downgrading to Equal Weight on Efzofitimod Phase 3 Failure, Price Target Moves to $1, WELLS FARGO SECURITIES*, September 15, 2025.

[58] *See* Yi Chen, *Efzofitimod in PS Phase III (EFZO-FIT) Study Failed to Meet Primary Endpoint, Reducing TP to $3.50*, LAIDLAW & COMPANY, September 15, 2025.

[59] *See* aTyr Pharma (ATYR): Phase 3 Failed to Show Significant Reduction in Steroid Use; Conf Call at 8:30am ET Today, JONES TRADING, September 15, 2025.

merely optimistic but were affirmatively misleading, and that no reasonable investor, lacking such specialized training, could have been expected to see through them.

290. The corrective disclosure on September 15, 2025 revealed the falsity of multiple categories of prior misrepresentations. First, it revealed that Defendants' claims about the Phase 1b/2a trial establishing "proof of concept" and "dose response" were false — the Phase 3 trial's failure confirmed that the Phase 1b/2a data was not a reliable basis for a pivotal trial, exactly as a properly powered Phase 2b study would have revealed. Second, it revealed that Defendants' claims that the trial was "always overpowered" and "powered more than 90%" were false. Third, it revealed that the endpoint changes Defendants characterized as "materially positive" had in fact contributed to the trial's failure, as the high placebo response that was foreseeable from the Phase 1b/2a data overwhelmed the narrower endpoint measure. Detecting each of these categories of falsity before the corrective disclosure required specialized scientific and biostatistical expertise: understanding the limitations of a 37-patient study, calculating trial power, and recognizing that a high Phase 1b/2a placebo response would recur in a Phase 3 trial with a forced steroid taper. These are analytical tasks that lie well beyond the competence of even sophisticated investors without expert training in clinical trial design.

291. The causal link between Defendants' misrepresentations and the economic loss is further confirmed by the fact that aTyr's stock price had been artificially inflated by Defendants' false statements throughout the Class Period. Analysts covering aTyr assigned valuations — ranging from $9 to $35 per share — premised on the probability of Phase 3 success, which in turn was based on Defendants' representations about Proof of Concept, dose response, and 90%+ statistical power. Each of these price targets would have been substantially lower had the analysts known the truth — that the Phase 1b/2a trial had shown only "directionality" rather than Proof of Concept, that dose response had not been

established, and that the Phase 3 trial did not have the required number of patients to achieve 90% statistical power.

292. The September 15 disclosure event only partially revealed the fraud, while concealing risks that would later materialize in May 2026. While the September 15 disclosure revealed the primary-endpoint failure, it did not reveal that the broad population was ill-suited to demonstrate an FVC effect, that monthly dosing might be inadequate, or that the sample size scheme could not support the power Defendants promised, thereby concealing the risk that the FDA would reject the EFZO-FIT data as a basis for approval.

293. The May 11 and May 12, 2026 disclosures constitute the materialization of these concealed risks. The FDA rejected the Phase 3 trial data as a basis for the Efzofitimod BLA approval, required an entirely new pivotal trial, and directed aTyr to use an FVC primary endpoint in a narrowly defined restrictive-phenotype population with more frequent dosing. Those changes confirmed that the Phase 1b/2a data had not supported the Phase 3 design, that the enrolled population and dosing regimen were not capable of demonstrating a drug effect, and that the endpoint architecture and powering Defendants claimed were unsound. The stock declined from $0.95 on May 11 to approximately $0.53 on May 12, an approximately 44% single-day decline on heavy trading volume.

294. The May 15, 2026, first-quarter results constituted a further materialization of the concealed risk. The Company revealed that its $68.3 million cash position was insufficient to fund a global 372-patient, 54-week Phase 3 study, and the market accordingly priced in imminent, highly dilutive financing. aTyr's stock price fell from approximately $0.56 per share on May 14 to approximately $0.50 per share on May 15, a single-day decline of approximately 10%.

295. The difference between the pre-disclosure and post-disclosure stock price represents the quantifiable economic harm caused by Defendants' fraud.

## X. CLASS ACTION ALLEGATIONS

296. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities other than Defendants that purchased or otherwise acquired aTyr common stock between June 5, 2024, and May 15, 2026, both dates inclusive (the "Class"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants, former and current officers and directors, and senior managers of aTyr, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

297. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, aTyr securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are several thousand members in the proposed Class. aTyr's most recent Annual Report filed with the SEC on Form 10-K indicates that as of March 2, 2026, there were 27 holders of record of its common stock. Because most stock is held in "street name" by brokers, Plaintiffs are informed and believe that the actual number of impacted shareholders is many times higher. As of March 2, 2026, aTyr had approximately 98,051,212 common shares outstanding. Record owners and other members of the Class may be identified from records maintained by aTyr or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

298. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

299. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

300. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants made misrepresentations and omissions in violation of the securities laws;
- whether Defendants' misrepresentations and omissions were material;
- whether Defendants acted with scienter;
- whether the prices of aTyr securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether Plaintiffs and other members of the Class have sustained damages and, if so, what is the proper measure of damages.

301. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

302. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- aTyr securities traded in an efficient market;
- aTyr's common stock was liquid and traded with moderate to heavy volume during the Class Period;
- aTyr's common stock traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold aTyr securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

303. Based upon the foregoing, Plaintiffs and other members of the Class are entitled to a presumption of reliance upon the integrity of the market.

304. Alternatively, Plaintiffs and other members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the claims alleged herein sound primarily in the omission of material information rather than affirmative misrepresentation.

**COUNT I:**
**(Violations of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)**

305. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

306. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

307. During the Class Period, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially misleading statements described above that were designed to influence the market for aTyr common stock. The statements described above were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Efzofitimod's clinical trials.

308. Defendants either had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose facts to render their statements not misleading, although the material facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

309. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

310. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of aTyr's public statements. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to aTyr's business and operations, including the clinical trials for Efzofitimod. As a result of the dissemination of the aforementioned false and misleading statements, the market price of aTyr common stock was artificially

inflated throughout the Class Period. In ignorance of the adverse facts concerning Efzofitimod's clinical trials, which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired aTyr common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

311. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired aTyr's common stock, or would not have purchased or otherwise acquired it at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of aTyr's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of aTyr's common stock declined upon public disclosure or materialization of the concealed risks alleged herein to the injury of Plaintiffs and other Class members.

312. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

313. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's common stock during the Class Period, upon the disclosure or materialization of the concealed risk that the Company had been disseminating misleading statements to the investing public regarding Efzofitimod's clinical trials.

**COUNT II:**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants)**

314. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

315. During the Class Period, Defendants employed devices and artifices to defraud, and carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (b) caused Plaintiffs and the other members of the Class to purchase aTyr's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants made the misleading statements alleged in Paragraphs 156 through 213, and engaged in additional unlawful acts as alleged herein.

316. Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in acts, practices or course of business that operated or would operate as a fraud or deceit, or otherwise employed a device, scheme or artifice to defraud.

317. Specifically, Defendants employed the following devices, schemes and artifices to defraud aTyr's investors and engaged in the following acts, practices, and illegal course of conduct:

- Defendants analyzed the efficacy data and found that it was trending negatively; and
- After observing that Efzofitimod's potential to demonstrate efficacy was at serious risk, Defendants substituted one secondary endpoint and re-shuffled the order for the other two secondary endpoints without disclosing the reasoning to investors.

318. As a result of Defendants' fraudulent scheme and failure to disclose material facts, the market price for aTyr's common stock was artificially inflated during the Class Period.

319. At the time Defendants orchestrated this fraudulent scheme, Plaintiffs and other members of the Class were ignorant of its nature or existence. Had Plaintiffs and the other members of the Class known the truth about this unlawful scheme, they would not have purchased or otherwise acquired aTyr's common stock,

or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

320. As a direct and proximate result of the fraudulent scheme and misconduct alleged herein, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of aTyr's common stock during the Class Period.

321. By virtue of the foregoing, Defendants thus violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and other Class members who have been damaged as a result of such violations.

**COUNT III:**
**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

322. Plaintiffs repeat, reallege, and reincorporate the allegations contained in the above paragraphs as if fully set forth herein.

323. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and/or indirectly, in the conduct of the Company's business affairs. Because of their senior positions, the Individual Defendants knew the adverse non-public information about Efzofitimod's clinical trials.

324. As senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by aTyr, which had become materially false or misleading.

325. Because of their positions of control and authority as senior officers of aTyr, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which aTyr disseminated in the marketplace during the Class Period concerning their misrepresentations and omissions. Throughout the Class Period, the Individual Defendants exercised their

power and authority to cause aTyr to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of aTyr's common stock.

326. The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior positions, the Individual Defendants had the power to direct the actions of, and exercised the same to cause aTyr to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

327. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay all damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 11, 2026

Respectfully submitted

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Lucas E. Gilmore*
LUCAS E. GILMORE

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Joshua Bloom and Andrea Holliday Bloom and Co-Lead Counsel for the Class*

POMERANTZ LLP

By /s/ *Genc Arifi*
GENC ARIFI

Omar Jafri (*pro hac vice*)
Genc Arifi (*pro hac vice*)
Ten South La Salle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
ojafri@pomlaw.com
garifi@pomlaw.com

*Counsel for Insun Lee and Co-Lead Counsel for the Class*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Anthony Fairris and Karyn Fairris*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Lucas E. Gilmore*